C.B.S. EMPLOYEES FEDERAL CRED-IT UNION, Plaintiff–Appellee,

v.

DONALDSON, LUFKIN AND JEN-RETTE SECURITIES CORPORATION; and Joseph Donnelly, Defendants–Appellants,

and

Southern Securities Investment Bankers, Inc.; F. Lin Lawrence; James E. McBride, Sr.; John Lowery and Robert (Bobby) Sullivan, Defendants.

No. 89–5601.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 26, 1990.

Decided Sept. 7, 1990.

Bruce S. Kramer, Martin H. Aussenberg, F. Guthrie Castle, Jr. (argued), Borod & Kramer, Memphis, Tenn., for plaintiff-appellee.

Stephen D. Wakefield, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, Tenn., Robert A. Zauzmer, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Susan L. Hoffman (argued), Rondal D. Tobler, Tuttle & Taylor, Los Angeles, Cal., for defendants-appellants.

Before MARTIN and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

Defendants Donaldson, Lufkin and Jenrette Securities Corporation (DLJ) and Joseph Donnelly, a senior vice president of DLJ and general counsel for DLJ's Pershing Division, appeal the denial of their motion for stay of this securities fraud action pending arbitration under the Federal Arbitration Act, 9 U.S.C. § 3. We affirm.

I.

C.B.S. Employees Federal Credit Union invested substantial funds in investments of various kinds. In November 1987, Ed Rostohar, the CBS manager in charge of CBS' securities transactions, opened an account with Southern Securities Investment Brokers, Inc. and purchased over $4 million in bonds and other securities for CBS for long-term investment.

Donaldson, Lufkin and Jenrette Securities Corporation served as Southern's clearing agent. Southern forwarded the securities transactions placed by CBS to DLJ's Pershing Division which carried out the transactions and performed the necessary record keeping tasks. The securities purchased by CBS were held in trust by DLJ in safekeeping accounts for long-term investment. DLJ also prepared the monthly account statements for CBS and other Southern customers. On the reverse side of the monthly account statements there was printed an "Agreement" providing for the arbitration of "any controversy between [CBS and DLJ], except for disputes ... which are non-arbitrable as a matter of law...."

In June 1988, Rostohar learned of some unauthorized transactions in CBS' account and instructed Southern to stop the unauthorized trading and to obtain Rostohar's express authorization for any future transactions involving the CBS account.

On July 18, 1988, Southern informed CBS that another Southern customer had committed to purchase a $15 million government bond paying 9% interest but that the customer could not take delivery on time but could take delivery a week later. Southern asked whether CBS was interested in buying the bond for the one-week period. CBS agreed to purchase and hold the $15 million GNMA bond for one week, using its own 7¾%, $1,012,826 GNMA bond as collateral, thereby earning the new bond's interest for one week. CBS agreed to purchase the $15 million bond on margin; that is, its purchase was to be funded by borrowing the purchase money from Southern. DLJ advanced the funds for the purchase but required CBS to sign a margin agreement to protect DLJ's interests.

On July 19, 1988, CBS' Rostohar received the margin agreement in the mail with directions to sign and return copies to DLJ and Southern. Rostohar did so on July 22, 1988. Although Rostohar thought only the

7¾% bond was being pledged as security, the language of the margin agreement pledged all of CBS' investments held in trust by DLJ. The margin agreement provided:

**LIEN**

4. All securities, commodities and other property of the undersigned which you may at any time be carrying for the undersigned, or which may at any time be in your possession or under your control, shall be subject to a general lien and security interest in your favor for the discharge of all the undersigned indebtedness and other obligations to you, without regard to your having made any advances in connection with such securities and other property and without regard to the number of accounts the undersigned may have with you. In enforcing your lien, you shall have the discretion to determine which securities and property are to be sold and which contracts are to be closed.

The margin agreement also contained an arbitration clause:

18. It is agreed that any controversy between us arising out of your business or this agreement, except for those disputes between us arising under the federal securities laws which are or are held to be non-arbitrable as a matter of law, shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc., or any other national securities exchange on which a transaction giving rise to the claim took place or pursuant to the Code of Arbitration Procedures of the National Association of Securities Dealers, Inc., as the undersigned may elect.

CBS later discovered that the $15 million bond transaction never occurred. What did occur was considerable unauthorized trading in CBS' account by Southern which resulted in substantial losses. All attempts by CBS to reverse these trades failed and, in August 1988, DLJ, relying upon the terms of the margin agreement and the agreement on the reverse side of the monthly statements, sold securities from CBS' account with Southern to pay the account's outstanding debit balance.

**A.**

On September 7, 1988, CBS filed this action against Southern, several of Southern's officers, Southern's clearing agent, DLJ, and DLJ's senior vice president Joseph Donnelly, alleging claims under federal and state of Tennessee securities laws, state common law, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

CBS also sought a declaratory judgment that the margin agreement and its arbitration clause were procured by fraud and, thus, were unenforceable. CBS claimed that the one week $15 million bond purchase proposal was merely a pretense to obtain Rostohar's signature on the margin agreement, and that the real purpose in tendering the margin agreement was to enable defendants to fraudulently obtain a lien on CBS' securities in order to cover for losses occurring as a result of the unauthorized trading which began in July.

DLJ and Donnelly moved for stay of proceeding in the district court pending arbitration, pursuant to 9 U.S.C. § 3. Section 3 provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....

In its response, CBS argued that the first question the court must decide is whether there was an agreement to arbitrate at all, since the margin agreement was procured by fraud and the monthly account statement with its printed arbitration provision was not a contract. Moreover, CBS argued, even if arbitration is required, Donnelly was not a party to the agreement and had no right to compel arbitration.

## B.

In its written opinion denying defendants' motion to stay the action pending arbitration, the district court discussed only the arbitration agreement contained in the margin agreement; it did not discuss the arbitration language on the reverse side of the monthly statements.

The court noted that arbitration requires "an effective agreement between the parties." It then drew a distinction between "fraud in the inducement" and "fraud in the factum" and observed that "[w]here the allegation is one of fraud in the factum, as opposed to fraud in the inducement, the issue is not subject to resolution, pursuant to an arbitration clause contained in contract documents." *Cancanon v. Smith, Barney, Harris & Upham Co.*, 805 F.2d 998, 1000 (11th Cir.1986). The court explained that fraud in the factum is a misrepresentation of the character and essential terms of the contract while fraud in the inducement is a misrepresentation which induces the party to sign the contract. The district court concluded that the allegation of fraud in this case is one of "fraud in the factum" and, that being so, the case is one for the court and not the arbitrator to decide.

It is a claim of "fraud in the factum," according to the district court, because CBS contends that it did not assent to the terms of the margin agreement Rostohar signed. The district court pointed out that CBS contended that it intended to pledge only one bond as security for a one week $15 million transaction, not its entire portfolio; yet the margin agreement, by its terms, authorized DLJ to hold all of the securities owned by CBS as collateral for all losses incurred. The district court concluded:

> "Where the very nature of the agreement is placed in contention as opposed to the circumstances surrounding a party's assent, then that dispute is not arbitrable...." *Dougherty [v. Mieczkowski,* 661 F.Supp. 267 (D.Del.1987)] at 274.

Since plaintiff's allegations of fraud go to the "very nature of the agreement," it is for this Court and not the arbitrator, to determine whether an agreement exists. Therefore defendants' motions to stay the proceedings pending arbitration are hereby denied.

Following the court's denial of defendants' motion to stay the proceedings, DLJ and Donnelly filed this appeal.

## II.

It appears that the district court's sole basis for denying defendants' motion to stay the proceeding pending arbitration is its conclusion that CBS contends the margin agreement was procured by fraud in the factum rather than fraud in the inducement, and if such fraud is found, the arbitration clause contained in the margin agreement would be without effect.[1] We respectfully disagree with the district court's analysis but not with its conclusion.

## A.

The district court's fraud in the factum/fraud in the inducement distinction may offer a legitimate means of analyzing this case, but we think it may more confound than clarify the dispositive issue and its resolution.

■ The central issue, reduced to its simplest, is whether CBS' claim of fraud relates to the making of the arbitration agreement. If it does, the court should adjudicate the fraud claim. If it does not, then the Federal Arbitration Act requires that the fraud claim be decided by an arbitrator. We reach that conclusion, as we explain more fully hereafter, in obedience to the teaching of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

In *Prima Paint*, the parties signed a written agreement by which Prima purchased Flood's paint manufacturing business and retained Flood's services as a consultant. The agreement included a clause calling for arbitration of "[a]ny con-

1. The court did not address the other issues raised by the parties to this appeal: 1) whether the arbitration agreement on the reverse side of the monthly account statements sent to CBS required arbitration of plaintiff's claim; and 2) whether Donnelly, as an agent of DLJ, was entitled to require arbitration of the claims against him. Since the district court did not address these issues, we shall not address them on appeal.

troversy or claim arising out of or in relation to this agreement, or the breach thereof. . . ." Shortly after the execution of the agreement, Flood filed for bankruptcy. When Prima complained that Flood had fraudulently induced Prima to enter into the purchase and consulting agreements on the false representation that Flood was solvent, Flood promptly demanded that the dispute be arbitrated. Prima then filed suit in the federal district court seeking recision of the consulting agreement on the basis of the alleged fraudulent inducement and contemporaneously sought an order restraining Flood from proceeding with the arbitration.

Citing section 3 of the United States Arbitration Act of 1925, 9 U.S.C. §§ 1–14, the Supreme Court declared that when suit is brought in a federal court "upon any issue referable to arbitration under agreement in writing for such arbitration," § 3 requires the Court "to stay the . . . action pending arbitration once it is satisfied that the issue is arbitrable under the agreement." 388 U.S. 395, 400, 87 S.Ct. 1801, 1804. That being so, the Supreme Court said, the specific issue in *Prima* was whether the federal court or an arbitrator should resolve a claim of fraudulent inducement of a contract governed by the arbitration act. The Supreme Court held:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it but the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

388 U.S. at 403–04, 87 S.Ct. at 1806 (footnote omitted).

Having thus distinguished between an attack on the contract as a whole from an attack on the arbitration clause itself, the Court stated:

> [I]n passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate.

*Id.* at 404, 87 S.Ct. at 1806. The Court declared that its conclusion was supported by the plain meaning of the arbitration act

and by the intent of Congress that agreements to arbitrate "be speedy and not subject to delay and obstruction in the courts." *Id.*

Consequently, under *Prima Paint,* when a claimant seeks to set aside an agreement containing a section 3 arbitration clause on the basis of fraud, the court will only decide challenges to the arbitration clause. If the arbitration clause is not at issue, then the arbitrator will decide challenges to the contract containing the arbitration clause.

In this case, the district court's way of describing that rule was to distinguish between fraudulent inducement of a contract and fraud in the factum of a contract. It found that this is a case of fraud in the factum because CBS was fraudulently led to believe the margin agreement was an agreement to pledge only one bond as security for its purchase when, in fact, the agreement required a pledge of CBS' entire portfolio. In that, we think the district court was mistaken.

In *Rhoades v. Powell,* 644 F.Supp. 645, 653 (E.D.Cal.1986), a district court in the Ninth Circuit restated the *Prima Paint* doctrine correctly:

> The *Prima Paint* doctrine is not limited, however, to rescission based on fraudulent inducement, but extends to all challenges to the making of a contract: "The teachings of *Prima Paint* is that a federal court must not remove from the arbitrator's consideration a substantive challenge to a contract unless there has been an independent challenge to the making of the arbitration clause itself. The basis of the underlying challenge to the contract does not alter the [*Prima Paint*] principle." (Quoting *Unionmutual Stock Life Ins. Co. of Amer. v. Beneficial Life Ins. Co.,* 774 F.2d 524, 529 (1st Cir.1985) (other citations omitted)).

Thus, although the *Prima Paint* case involved a claim of fraudulent inducement, the rule the court announced was more general: when the issues in dispute do not involve the making or the performance of the section 3 arbitration clause itself, the agreement's arbitration clause is enforced

**1568**

and the parties' dispute must be submitted for resolution by arbitration.

**B.**

■ The question here reduces itself then, to whether CBS' fraud claim involves the making of the arbitration clause.

CBS claims the margin agreement and the arbitration clause were secured by fraud in order to cover up the unauthorized trading occurring in the accounts CBS had with Southern.[2] Where, as here, the plaintiff affirmatively pleads that the contract and the arbitration agreement included therein were procured through fraud, the court should determine whether the arbitration clause was used to further the fraudulent scheme.

As the court in *Prima Paint* held: "If the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making of the agreement to arbitrate'—the federal court may proceed to adjudicate it." 388 U.S. at 403-04, 87 S.Ct. at 1806. The Court in *Prima Paint* found its holding consistent with the decision in *Moseley v. Electronic Facilities*, 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963), and with the statutory purpose of the Arbitration Act—to make arbitration agreements as enforceable as other contracts. 388 U.S. at 404 n. 12, 87 S.Ct. at 1806 n. 12. In *Moseley*, the Court held that where a plaintiff's pleading attacks the contract in general, as well as the arbitration clause contained therein, the allegation of fraud as to the arbitration clause should be decided by the district court. 374 U.S. at 171, 83 S.Ct. at 1817-18.

2. Plaintiff's complaint alleges:

*Fraudulent Procurement:*

104. As discussed in the preceding paragraphs, the Defendants in this instance had already engaged in unauthorized and wrongful trades in Plaintiff's account when the agreement was signed. The purpose of these trades, at least in part, was undoubtedly for the procurement of commissions. When some of the unauthorized unpaid-for trades could not be paired off, however, the Defendants were forced to deliver unauthorized securities to the Plaintiff's account. The Defendants thereafter conspired to fraudulently procure from the Plaintiff a signed Arbitration Agreement and Margin Agreement so as to coerce Plaintiff into ratifying these trades

In this case, plaintiff's complaint alleges defendants fraudulently procured their assent to the margin agreement *and* the arbitration clause contained therein to coerce plaintiff into ratifying the unauthorized trading occurring in its accounts. Thus, the holding of *Moseley* and *Prima Paint* requires that the district court adjudicate the validity of the arbitration clause and, in turn, the court's decision will determine who, the court or an arbitrator, decides the attack on the margin agreement. *See also Rush v. Oppenheimer & Co.*, 681 F.Supp. 1045, 1048-53 (S.D.N.Y.1988).

**III.**

The judgment of the district court denying CBS' motion for a stay of proceedings is AFFIRMED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

by deprivation of a judicial forum for resolution of the dispute, by threatening to liquidate the safekeeping securities, and by inclusion of exculpatory language as to Pershing.

105. Because the Arbitration Agreement and Margin Agreement are each part and parcel of Defendants' overall scheme to pass losing transactions off on CBS FCU, and to obtain substantial, hidden and unjustified commissions, the deceit, fraud and trickery by the Defendants in procuring the Arbitration Agreement and Margin Agreement so permeates these agreements that the issue of the enforceability of either agreement must be adjudicated by this Court. To compel arbitration on this issue would be to grant the Defendants fulfillment of their fraud.