**HIRES PARTS SERVICE, INC. d/b/a Hires Auto Parts, Plaintiff,**

**v.**

**NCR CORPORATION, Defendant.**

**Civ. No. 1:94cv102.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 5, 1994.

Eric E. Snouffer, Snouffer and Snouffer, Fort Wayne, IN, Lynn Lincoln Sarko, Mark Griffin, Keller, Rohrback, Seattle, WA, Donald L. Perelman, Melinda L. deLisle, Jeffrey S. Istvan, Fine Kaplan and Black, Philadelphia, PA, John W. Boyd, Joseph Goldberg, Freedman Boyd Daniels Peifer, Hollander Guttman & Goldberg, Albuquerque, NM, for plaintiff.

Robert E. Connolly, O'Dowd Wyneken and Connolly, Fort Wayne, IN, for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on a motion for an order to compel arbitration and stay court proceedings filed on June 20, 1994 by the defendant, NCR Corporation ("NCR"). The parties finished briefing the motion on July 19, 1994.

### Discussion

On April 5, 1994, the plaintiff, Hires Parts Service, Inc. d/b/a/ Hires Auto Parts ("Hires"), filed this diversity action against NCR. In its ten count complaint, Hires asserts claims for (1) fraud/negligent misrepresentation; (2) negligence; (3) breach of contract; (4) breach of contract (repudiation); (5) declaratory judgment (unconscionability); (6) fraud in inducing Hires to agree to forego certain remedies, causes of action, and forums; (7) breach of warranty; (8) intentional or negligent failure to disclose material facts and/or breach of fiduciary duty; (9) breach of implied covenant of good faith and fair dealing; and (10) punitive damages.

NCR filed its answer and affirmative defenses on April 28, 1994. NCR has asserted eight enumerated affirmative defenses including a defense that the matters in controversy in this action are subject to a written agreement to arbitrate.

The relevant factual allegations as set forth in Hires' complaint, the majority of which are denied by NCR, are as follows. Hires, which is in the business of selling auto parts, began searching in 1985 for a computer system for use primarily in inventory management, point of sale scanning, instant invoicing, purchasing, accounts payable, accounts receivable, and general ledger. NCR allegedly represented to Hires that an NCR computer system would meet Hires' needs and that this system was successfully operating at two hundred user locations. Hires alleges that in June of 1987 it agreed to purchase the NCR system, together with system support, training, and maintenance. Hires further alleges that the NCR system was continually modified and upgraded through July, 1990.

Hires alleges that the NCR system has never performed properly. Hires has allegedly experienced serious problems with the system such as locking up, lost or altered data, slow downs, insufficient memory, and inoperable functions. Hires claims that users across the country were having similar problems with the NCR system and that NCR knew, at the time it sold its system to Hires, that the system would not work properly. Hires further claims that NCR knew that the software it sold to Hires and others was not compatible with the NCR operating system and that the software had not been properly tested and debugged.

Hires claims that rather than acknowledging that the NCR system and the accompanying software were flawed or that other users of such systems were experiencing similar problems, NCR repeatedly and intentionally misrepresented to Hires that Hires was the only user experiencing such problems and/or that the problems were all caused in some way by Hires.

Count One and Count Six of Hires' complaint are central to the present motion and will thus be set out below. Count One of the complaint alleges fraud/negligent misrepresentation and states that:

32. NCR made numerous misrepresentations of fact concerning (1) NCR's intentions with respect to servicing, upgrading, and supporting the computer system it was proposing to sell to Hires; (2) NCR's true involvement with the application software, which was an important part of the system; (3) the nature and quality of the computer system sold to Hires; (4) the causes of the problems Hires experienced with the computer system from the time it was installed through the late summer of 1993; (5) Hires' need for upgrades, additions, and expansions of the computer system; (6) the extent to which NCR would "stand behind" the system and the extent to which Hires would be able to obtain effective remedies to problems with the system; and (7) the cost savings Hires would experience from using the system.

Specifically, NCR made the following material misrepresentations:

a. That the NCR computer system was a "single vendor" system, meaning that NCR developed, owned, and had responsibility for all of the hardware and software that comprised the system and was fully capable and willing to support all elements of the system, including the applications software. In this regard, NCR misrepresented that TMS [software] was "a part of" NCR.

b. That NCR had the intent and capability to support the system, including the application software, fully and expeditiously, through its own locally situated offices and personnel.

c. That the NCR computer system was capable of meeting Hires' needs not only when sold but also for five or more years thereafter.

d. That the system was "user friendly" so that it would not need a dedicated data processing supervisor, would be subject to minimal "down time," and would be capable of being used with minimal instruction and training on Hires' site.

e. That, at the time of initial sale to Hires, the system was being used by more than 200 users in the marketplace without any substantial problems and that the experience in the marketplace was that the system was highly reliable. NCR repeated this misrepresentation throughout.

f. That the system would allow Hires to service its customers in a timely, efficient and reliable manner.

g. That the system would reasonably accomplish the tasks identified by Hires and NCR in NCR's proposal to Hires, including: complete inventory management by store and warehouse, point of scale [sic] scanning, instant invoicing, purchasing, accounts payable, accounts receivable, and general ledger.

h. That the problems that Hires was experiencing with the system were caused by Hires' personnel, specifically because of their lack of experience, training, and proper use of the system.

i. That the problems Hires was experiencing with the system were unique to Hires and that NCR was unaware of other users having experienced problems similar to Hires'.

j. That the problems Hires was experiencing would be cured if Hires purchased additional equipment, upgrades, and service from NCR.

k. That NCR was a reliable vendor, that NCR would be available to cure any problems with the system, that Hires would receive effective remedies to any problems Hires might have with the system, and that Hires would not be left with a defective system and no effective remedy available.

33. The representations described in paragraph 32 above were false. NCR knew that the representations were false or failed to exercise reasonable care to refrain from making the false representations.

34. NCR made the false representations described in paragraph 32 above for the purposes of inducing Hires to enter into the contract to purchase the NCR system, distracting Hires from the true causes of the problems Hires was having with the system, and deterring Hires form acting to remedy the problems with the system, including exercising legal remedies.

35. Hires justifiably believed the representations and, as a consequence, (a) purchased the system, and including the original configuration, the additional equipment, upgrades, and services; (b) expended hundreds of thousands of dollars unnecessarily and without any benefit to Hires; (c) expended hundreds of manhours attempting to cure problems in the system or performing manually functions which the system should have performed; (d) did not discover for more than six years the true cause of the problems with the system; and (e) did not exercise its remedies against NCR.

36. As a proximate result of the fraudulent and/or negligent misrepresentations made by NCR, Hires suffered economic injury, including financial expenditures and injury to its business.

Count Six of Hires' complaint alleges fraud in inducing Hires to agree to forego certain remedies, causes of action, and forums. Count Six states that:

51. NCR knew, or was chargeable with knowledge, when it sold the system to Hires, that the system would not work and would cause Hires substantial economic harm.

52. In order to mitigate NCR's exposure to liability arising from the defects known to NCR but not disclosed to Hires and to keep from Hires and others knowledge of NCR's wrongdoing, NCR required certain Hires' employees to sign NCR's so-called "Universal Agreement," which contained the following language: (a) a requirement that Hires submit any claims to arbitration; and (b) a requirement that Hires agree to forego claims for much of the damages which NCR knew Hires would suffer but which Hires had no reason reasonably to suspect it might suffer because of NCR's fraudulent misrepresentation to Hires about the quality of the computer system.

53. The insertion of the arbitration clause and limitation of remedies was a part of NCR's scheme to defraud all of NCR's customers of the system, including Hires, and was intended by NCR as a fraudulent device to escape the consequences of its misconduct.

54. As a consequence of NCR's fraud, these provisions of the Universal Agreement are void and, in addition, Hires is entitled to compensatory and punitive damages.

In support of its present motion, NCR points out that Hires purchased the computer system from NCR under the terms of a "Universal Agreement" which includes a broad arbitration clause. Specifically, Section 19 of the Universal Agreement states:

DISPUTES—Any controversy or claim, including any claim of misrepresentation, arising out of or related to this Agreement and/or any contract hereafter entered into between NCR and Customer, or the breach thereof, or the furnishing of any equipment or service by NCR to Customer, shall be settled by arbitration. The arbitration shall be conducted by a single arbitrator under the then current rules of the American Arbitration Association, the arbitrator shall be chosen from a panel of persons knowledgeable in business information and data processing systems. The decision and award of the arbitrator shall be final and binding and the award so rendered may be entered in any court having jurisdiction thereof. The arbitration shall be held and the award shall be deemed to be made in the city where the NCR district office procuring the order is located.

NCR claims that by initiating this action, Hires has raised claims or controversies arising out of or related to the furnishing of equipment or service by NCR, and thus Hires' claims are within the scope of the Universal Agreement's arbitration provision.

■ In response to NCR's motion, Hires argues that it has alleged and will prove that NCR intended the arbitration clause itself as an instrument of fraud. Hires points out that the federal courts have held that the issue of the vitality of the arbitration clause is for the court, not the arbitrator, and a party is entitled to litigate the issue of whether an arbitration clause was fraudulently procured, before the court orders arbitration. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 401–05, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967) (when there is a claim that there was "fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the ... court may proceed to adjudicate it."); *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1278 (6th Cir.1990) (if there is a claim that the "making" of the agreement to arbitrate, viewed in isolation from the contract as a whole, was induced by fraud, the court should not order arbitration).

The crux of Hires' claim is its allegation that NCR knew, when Hires signed the Universal Agreement, that Hires was going to be seriously damaged by the system and that it was likely that Hires would sue NCR. Hires additionally claims that NCR included the arbitration clause in the agreement for the fraudulent purpose of shielding itself from

the discovery procedures available in court because NCR knew that discovery would conclusively expose its fraud. Hires believes that discovery is not generally available in arbitration proceedings and, thus, it would be unable to procure the evidence needed to prove fraud.

■ NCR, however, argues that discovery is available in arbitration proceedings and, thus, if any fraud was committed by NCR, Hires will be able to use discovery methods to produce the evidence it needs to prove this alleged fraud. NCR cites *Recognition Equipment Inc. v. NCR Corp.*, 532 F.Supp. 271 (N.D.Tex.1981), and *Mississippi Power Co. v. Peabody Coal Co.*, 69 F.R.D. 558 (S.D.Miss.1976), for the proposition that, due to the availability of discovery in arbitration proceedings, discovery is properly stayed in a court action. Both of these cases make reference to Section 7 of the Federal Arbitration Act (9 U.S.C. § 7) which authorizes arbitrators to summon witnesses, books, records, documents, and papers deemed material as evidence in the case[1]. As the court noted in *Mississippi Power:*

> It is thus readily apparent that under the contract which the parties made [in which the parties agreed that any controversy between them shall be determined under the rules of the American Arbitration Association] ... and under the applicable federal statute the arbitrator can compel the production (discovery) of every book, record, document and paper deemed

material to the appropriate resolution of the controversy between Mississippi Power and Peabody.

69 F.R.D. at 564.

Likewise, the court in *Recognition Equipment* held that a district court should not usually permit court-supervised discovery in a case that is to be arbitrated, in order to prevent "dual discovery" that would occur as a result of 9 U.S.C. § 7 which, as noted above, authorizes discovery in arbitration proceedings. *See* 532 F.Supp. at 273–74. *See also, Stanton v. Paine Webber Jackson & Curtis, Inc.*, 685 F.Supp. 1241, 1242 (S.D.Fla. 1988) (under the Arbitration Act, the arbitrators may order and conduct such discovery as they find necessary).

Consequently, the court finds Hires' belief that discovery is not available in arbitration proceedings to be erroneous and without merit. Furthermore, the court notes that Hires has not indicated, even generally, what type of evidence it believes it would not be able to present to the arbitrators and which would preclude Hires from proving its case. In fact, Hires has presented documents to this court which it claims proves its fraud claim and Hires has not even argued that it will not be able to present this evidence to the arbitrators[2].

Thus, it is clear to this court that Hires' argument that it will be unable to conduct discovery necessary to prove its case is meritless. In fact, as NCR points out, this argu-

---

1.  9 U.S.C. § 7 provides that:
    The arbitrators selected either as prescribed in this title or otherwise, or a majority of them, may summon in writing any person to attend before them or any of them as a witness and in a proper case to bring with him or them any book, record, document, or paper which may be deemed material as evidence in the case. The fees for such attendance shall be the same as the fees of witnesses before masters of the United States courts. Said summons shall issue in the name of the arbitrator or arbitrators, or a majority of them, and shall be signed by the arbitrators, or a majority of them, and shall be directed to the said person and shall be served in the same manner as subpoenas to appear and testify before the court; if any person or persons so summoned to testify shall refuse or neglect to obey said summons, upon petition the United States district court for the district in which such arbitrators, or a majority of them, are sitting may compel the attendance

of such person or persons before said arbitrator or arbitrators, or punish said person or persons for contempt in the same manner provided by law for securing the attendance of witnesses or their punishment for neglect or refusal to attend in the courts of the United States.

2.  Hires has presented to the court documents which evidence that NCR knew that some customers were dissatisfied with the NCR system. Although Hires claims that these documents prove its fraud claim, this court notes that the documents are not very persuasive as they are dated well after June 1987, the date Hires states in its complaint that it purchased the NCR computer system. (See Complaint at ¶ 11.) In fact, the earliest document is dated December 31, 1987, and the latest document is dated October 10, 1988.

ment was rejected by the Sixth Circuit Court of Appeals in *Arnold, supra.* In *Arnold*, the plaintiff's original complaint alleged only fraud in the inducement of the contract generally and did not challenge the "making" of the agreement to arbitrate. In its amended complaint, plaintiff belated sought to exploit the door left open in *Prima Paint*—that contractually prescribed arbitration will not be enforced if there is a well-founded allegation of fraud in connection with the "making" of the agreement to arbitrate. The Sixth Circuit stated:

> Although appellant in the present case argues that the arbitration clause was a fraudulent device intended to deny appellant discovery, we believe that this conclusory allegation could be inserted into any complaint involving fraud and arbitration cannot be accepted at face value.
>
> In the present case, appellant Arnold does not argue that the inclusion of the arbitration clause in the contract was effected by superior bargaining power or that, for all practical purposes, it deprived him of his day in court, as was the case in *Moseley* [*v. Electronic & Missile Facilities Inc.*, 374 U.S. 167, 83 S.Ct. 1815, 10 L.Ed.2d 818 (1963)]. Appellant instead alleges that the forum selection clause was inserted in the contract in order to keep him from effectively litigating his claim. He maintains that if he is forced to arbitrate the dispute, he will be denied the discovery which is necessary in order for him to prove his allegations. Although appellant's allegation is similar to the one in *Moseley* in that he alleges that the arbitration clause was used to effect a fraudulent scheme, the present case does not contain elements of a contract of adhesion or of a gravely difficult and inconvenient forum as *Moseley* did.
>
> Appellant Arnold's argument is based on the premise that the arbitration clause was included in the contract to deny him the fruits of discovery.... If the arbitrator were to deny Arnold access to the necessary records or persons to prove his claim and he were to lose, the judgment in favor of Arnold Corp. could be vacated under Section 10(d) of the Federal Arbitration Act, which permits a federal court to va-

cate an award where the arbitrators "so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter submitted was not made." Thus the arbitral forum is not one in which appellant is denied the opportunity to pursue his claims. We do not believe that amendment of the complaint to include a charge that the arbitration clause was intended to effect a larger fraudulent scheme by limiting discovery is sufficient to constitute a "well-founded claim" that the arbitration clause itself, standing apart from the agreement as a whole, was induced by fraud.

> \*    \*    \*    \*    \*    \*

> The district court was correct in stating that appellant failed to supply the court with factual circumstances indicating how the arbitration clause was to be used as a device to prevent plaintiff from discovering the alleged fraudulent stock purchase scheme. Appellant does not specify what information he will be denied access to in the arbitral forum that otherwise would have been available to him.

920 F.2d at 1278–79, 1280.

Hires relies heavily on *C.B.S. Employees Federal Credit Union v. Donaldson, Lufkin & Jenrette Securities Corp.*, 912 F.2d 1563 (6th Cir.1990). In *C.B.S.*, the Sixth Circuit held that where a plaintiff affirmatively pleads that the contract and the arbitration agreement therein were procured by fraud, the court should determine whether the arbitration clause was used to further the fraudulent scheme. 912 F.2d at 1568. However, as the Sixth Circuit noted in *Arnold*, 920 F.2d at 1278, n. 8, in *C.B.S.* the issue of whether the plaintiff sufficiently pled fraud in the inducement of the agreement to arbitrate to put the "making" of the agreement to arbitrate at issue was not raised. Therefore, the Sixth Circuit held that it was not bound by the *C.B.S.* decision when deciding the issue in *Arnold. Id.* Likewise, the *C.B.S.* decision is not controlling precedent in this case as this court has been called upon to decide whether plaintiff has sufficiently pled fraud in the inducement of the agreement to arbitrate.

Hires also cites to *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185 (9th Cir.1986), in support of its position that it has sufficiently alleged fraud in the inducement of the arbitration clause. In *Letizia*, the plaintiff was given the opportunity to amend his complaint and show that the arbitration agreement was unenforceable because it was independently induced by fraud. However, it is clear that in *Letizia* the court permitted the proposed amendment because it found that the plaintiff intended to attack only the arbitration clause and was not alleging that the underlying contract had been fraudulently procured. *See* 802 F.2d at 1188, n. 4. Thus, *Letizia* is completely contrary to the present case where, as noted in the above recitation of Count One of Hires' complaint, Hires has directly attacked the underlying contract and only weakly asserts that the arbitration clause was meant to prevent the discovery of the fraudulent inducement of that contract.

■ This court finds the *Arnold* decision, which NCR relies on, to be precisely on point. As in *Arnold*, the plaintiff herein bases its argument on the premise that the arbitration clause was included in the Universal Agreement to prevent it from conducting discovery. The *Arnold* court soundly rejected this argument. Further, plaintiff does not allege that the inclusion of the arbitration clause in the contract was effected by superior bargaining power or that, for all practical purposes, it deprives Hires of its day in court. Consequently, this court finds that Hires has not presented sufficient factual circumstances indicating that the arbitration clause, viewed in isolation from the contract as a whole, was induced by fraud. As Hires has not shown that the vitality of the arbitration clause is at issue, the court must order Hires to proceed to arbitration.

■ NCR has also requested that this court stay all proceedings in this court, including discovery proceedings. As it is obvious that permitting discovery on two levels, district court level and arbitration level, is a great waste of resources and frustrates the basic purpose of the Arbitration Act which is to avoid the delay and expense of litigation, this court will stay all court proceedings, including discovery. *See Mississippi Power, supra; Recognition Equipment, supra.*

■ NCR also claims that it is entitled to its costs and attorney fees incurred in compelling arbitration. The law is clear that in suits to compel one party to submit to arbitration or abide by an award, fees are generally awarded if the defaulting party acted without justification or if the party resisting arbitration did not have a "reasonable chance to prevail." *Chauffeurs, Teamsters and Helpers, Local No. 765 v. Stroehmann Brothers*, 625 F.2d 1092, 1094 (3d Cir.1980); *International Association of Machinists v. Texas Steel Co.*, 538 F.2d 1116, 1121 (5th Cir.1976).

■ This is clearly a case in which costs and attorney fees should be awarded. Hires has failed to cite even one decision which even weakly supports its position. Additionally, Hires has failed to present any argument to this court as to why the *Arnold* decision is not directly controlling. Finally, as NCR points out, two of the attorneys who are presently representing Hires, John W. Boyd and Joseph Goldberg of Albuquerque, New Mexico, have previously litigated, and lost, this identical issue in the United States District Court for the District of New Mexico. *See, NCR Corp. v. Hopper Specialty Co., Inc.*, Civ. No. 93–0791, 1994 WL 510999 (Jan. 28, 1994)[3]. As in the present case, the defendant in *Hopper* alleged that "[a]t the time NCR solicited Hopper's employer to execute the arbitration agreement, NCR knew that the system it was attempting to sell to Hopper was plagued with defects...." (Slip op. at 9, *quoting* defendant's response to NCR's motion for protective order at 2.)

Also as in the present case, the defendant in *Hopper* represented to the New Mexico district court that it had "already obtained NCR documents which support its claim of fraud...." The defendant in *Hopper* also alleged, as Hires alleges in the case presently

---

**3.** This case was appealed to the Tenth Circuit Court of Appeals; however, the appeal was dismissed on July 25, 1994.

before this court, that "in order to limit its exposure to liability for problems it knew to exist, NCR inserted the arbitration clause and the limitation on remedies as part of its scheme to defraud its customers and to escape the consequences of its conduct." (Slip op. at 10.)

After reviewing the documents submitted by the defendant, which appear to be similar or even identical to the documents submitted to this court, the New Mexico district court held that:

> Hopper has not made a minimal showing that it was fraudulently induced to enter into the arbitration clause itself as opposed to the contract as a whole. Hence this matter is for the arbitrator and not this Court to decide.

Slip op. at 11. *Hopper* was decided over two months before Hires filed its lawsuit against NCR. Consequently, it is clear that Hires' had notice that its argument with respect to the arbitration clause was not, to say the least, very persuasive and that, in the absence of authority supporting its position, it should not advance the same argument before another district court.

As it is abundantly clear that Hires did not have any justification for bringing this lawsuit against NCR and that it knew that it did not have a reasonable chance of prevailing against a motion to compel arbitration, the court will award costs and attorney fees to NCR.

### Conclusion

For all the foregoing reasons, NCR's motion to compel is hereby GRANTED and Hires is hereby ORDERED to proceed with arbitration. Further, NCR's request to stay court proceedings is hereby GRANTED and all proceedings in this cause number, 1:94cv201, are hereby STAYED. Further, NCR's request for costs and attorney fees is hereby GRANTED.