## In re GRAIN LAND COOP Cases.

### Civil No. 3–96–1209.

United States District Court,
D. Minnesota,
Third Division.

Oct. 1, 1997.

James R. Crassweller, John F. Kapacinskas, Doherty Rumble & Butler, St. Paul, MN, for plaintiff.

William David Taylor, III, Blethen, Gage & Kruse, Mankato, MN, Steven P. Wandro, Terry L. Gibson, Wandro & Gibaon, Des Moines, IA, for defendants.

## AMENDED MEMORANDUM AND ORDER

MAGNUSON, Chief Judge.

This matter is before the Court upon the Motion for Partial Summary Judgment brought by Grain Land Coop, Michael Christensen, and Joseph Burke. For the following reasons, the Court grants in part and denies in part the parties' motion.

## BACKGROUND

While the parties to this action find little common ground for agreement, the following factual recitation relates predominantly undisputed allegations. To the extent that the parties disagree about these facts, the disputes are not material to the disposition of the present motion. At all times relevant to these lawsuits, Grain Land Coop ("Grain Land") was a Minnesota agricultural cooperative association that operated in the southern part of the state of Minnesota. Grain Land regularly bought and sold grain as part of its grain elevator and agricultural services business. The grain was primarily provided by members of the cooperative who were local farmers and producers of agricultural commodities ("Producers"). Grain Land marketed the grain it purchased collectively for the Producers. Specifically, the Producers sold their grain to the cooperative through cash sales for immediate delivery or through contracts for deferred delivery. Grain Land then resold the grain and re-turned the profit to its member-Producers through patronage distributions.

In 1993, Grain Land began offering, in addition to other existing marketing arrangements, an instrument known as a Hedge to Arrive Contract, or Flex Hedge to Arrive Contract ("HTA"). These contracts were a variation on a familiar commodity marketing instrument, the fixed-price contract for deferred delivery. Like its close relative, the HTAs involved the sale of a fixed quantity of grain for deferred delivery. The contracts, however, incorporated a unique combination of features. For instance, the contracts permitted a Producer to set one pricing component, the "basis," [1] at a future date prior to delivery. At the time the contracts were executed, the parties would set a per-unit price based on a futures contract price from the Chicago Board of Trade ("CBOT") for a month within the crop's marketing year. The HTA contract cash price, then, was the sum of the set futures price plus the basis. In addition, the contracts called for offsetting, or "hedging," transactions to minimize the effects of price changes on the HTAs. Grain Land would take a sell, or "short," position on the CBOT to hedge the buy obligation for each HTA contract. In so doing, Grain Land was required to deposit and maintain a sum of money in margin accounts with the exchange. The margin accounts had to be increased if the equity in the hedge declined due to rising futures prices. Finally, the HTAs provided flexibility with respect to delivery. Specifically, the contracts permitted the Producers to postpone, or "roll," their delivery obligations into a later futures month. Thus, the HTA contracts provided flexible price-setting and grain-delivery terms for the Producers while obligating Grain Land to cover margin obligations for the corresponding hedging transactions made on the exchange.

The parties disagree about the circumstances giving rise to the offering of these contracts. On the one hand, Grain Land claims that various farmers requested the HTAs since other elevators had been utiliz-

---

1. Basis is the difference between the price of the cash commodity and the price of a designated futures contract for that commodity.

ing them in grain transactions. In contrast, the Producers allege that the decision to market these contracts came from Grain Land's general manager, Michael Christensen ("Christensen"), and grain merchandiser, Joseph Burke ("Burke"). Regardless, it is undisputed that Grain Land promoted the availability of this new instrument to the local farming communities and that the Producers entered into thousands of HTAs with Grain Land over the next three years. During that time, these contracts were utilized to market millions of bushels of corn and soybeans, with the Producers being the sellers and Grain Land the buyer. Moreover, contracts were executed and delivery was regularly made without occurrence or question.

In October 1994, the price of corn began an unprecedented steady rise. Traditionally, grain prices fluctuate with seasonal variations during the year and are low at harvest time. The "inverted" market that commenced in October 1994, however, lasted through 1995 and early 1996. Because of these market conditions and the terms of the contracts, many Producers deferred, or "rolled," the timing of their grain delivery obligations under the HTAs. This action, coupled with other factors, placed Grain Land in a difficult financial position due to the cost associated with rolling the delivery commitments.

This series of events precipitated an exchange between Grain Land and the Producers. In a letter to all Producers holding HTAs, dated April 4, 1996, Grain Land announced a series of "policy changes" adopted by its Board of Directors that included terminating the HTAs and requiring the execution of new contracts. (Master Answer & Countercl. & Third–Party Compl. Ex. 1.) In response, the Producers, through counsel, sent a letter to Grain Land, dated April 15, expressing concern about Grain Land's intent to honor the HTAs in the current form and demanding adequate assurances of Grain Land's intent to perform. (*See id.* Ex. 2.) In addition, the letter stated that if such assurances were not forthcoming the Producers would consider Grain Land's actions to be a repudiation of the contracts. (*See id.*)

Grain Land responded within the allotted time. In a letter dated April 17, Grain Land expressed its intent to honor its contractual obligations, including "any legal obligation to roll each of the contracts each time the Producer in question requests Grain Land to do so until the contract is terminated." (*See id.* Ex. 4.) Moreover, the letter stated that "Contract holders who desire to roll the hedge to arrive contracts beyond December 1996, must notify Grain Land prior to June 25, 1996 and enter into a new contract to do so." (*Id.*) (emphasis in original omitted). On June 21, the Producers informed Grain Land that they would not execute new contracts by the June 25 deadline. (*See id.* Ex. 5.)

In December 1996, Grain Land commenced lawsuits against approximately 160 Producers, all of whom were members of the cooperative in either individual or corporate capacities, were parties to HTAs, and had not delivered grain on the contracts that were the basis for suit. These actions were filed in Minnesota state district courts in various counties. The Producers removed the actions to federal court in September 1996, basing removal on federal question jurisdiction. Grain Land filed motions to remand that were subsequently withdrawn voluntarily.

In an effort to deal efficiently with these numerous filings, this Court ordered the creation of a master docket and case file. *See In re Grain Land Coop Cases,* Civil File No. 3–96–1209 (D.Minn. Dec. 31, 1996) (order and pretrial schedule). Pursuant to that order, the parties were directed to file master pleadings in accordance with a prescribed schedule. *See id.* On January 14, 1997, Grain Land filed its seven-count Master Complaint. In Count I, Grain Land seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the HTAs at issue are subject to the forward contract exclusion of the Commodity Exchange Act ("the CEA" or "the Act"), 7 U.S.C. §§ 1–25, and are enforceable against each Producer, and that the Producers must deliver the grain subject to the contracts. In Count II, Grain Land seeks an alternative declaration. Specifically, Grain Land requests an order declaring that the contracts are enforceable as between the par-

ties even if they are found to be futures contracts subject to the CEA; and a declaration that the Producers are obligated to deliver the grain and are liable for damages caused by their repudiation. Count III contains allegations that the Producers breached the contracts by failing to deliver the contracted grain. Count IV alleges that the Producers are estopped from denying the legality and enforceability of the contracts. In Count V, Grain Land seeks specific performance pursuant to Minnesota Statutes section 308A.205. Count VI contains allegations of unjust enrichment. Finally, in Count VII, Grain Land asserts a claim for misrepresentation.

Shortly thereafter, on February 7, Grain Land, along with Christensen and Burke, filed a Third–Party Complaint against the Farmers Commodities Corporation ("FCC"), an Iowa corporation ·qualified to conduct business in Minnesota. In the pleadings, Grain Land, Christensen, and Burke seek contribution and indemnification from the FCC to the extent that they are found liable to the Producers. On February 28, the FCC answered and counterclaimed against Grain Land for contribution and indemnification based on the terms of an agreement allegedly executed by the two parties.

The Producers filed their master pleadings on February 18, which included an eleven-count complaint asserting claims against Grain Land, Christensen, and Burke. As with Grain Land's Master Complaint, the Producers allege a mixture of federal and state law causes of action. In Counts I and II, the Producers seek a declaratory judgment that the HTAs are subject to and prohibited by the CEA and, accordingly, are unenforceable; and ordering the rescission of the HTAs based on a finding that Grain Land committed fraud under the CEA. In Count III, the Producers allege fraud under the CEA. Count IV asserts that Grain Land breached the contracts at issue. Count V contains allegations of common law fraud. In Count VI and VII, the Producers allege causes of action for fraudulent or material misrepresentation and seek rescission of the contracts and damages, respectively. Count VIII alleges that Grain Land's, Christen-

sen; and Burke's conduct constitutes negligent misrepresentation. In Count IX, the Producers allege a claim for breach of fiduciary duty. Count X asserts a claim for rescission of the HTAs. In their last claim, Count XI, the Producers assert a cause of action against Grain Land under the Prevention of Consumer Fraud Act, Minnesota Statutes section 325F.69.

After a period of discovery, Grain· Land, Christensen, and Burke filed the present motion for partial summary judgment on May 23, 1997. Therein, the parties seek summary judgment and dismissal of a majority of the Producers' counts and claims. In particular, the motion seeks judgment as a matter of law as to Count III (fraud under the CEA and damages), Count V (common law fraud), Count VII (fraudulent or material misrepresentation—damages), and Count VIII (negligent misrepresentation). Moreover, Grain Land seeks summary judgment on Count IV, breach of contract. Finally, Christensen and Burke request judgment as a matter of law on Count IX,, breach of fiduciary duty.

At the June 13 motion hearing, the Court concluded that the summary judgment motion should not go forward until the parties addressed a preliminary, fundamental issue: whether the HTAs were forward contracts or futures contracts. Cash commodity contracts for deferred delivery are commonly known as cash forward contracts ("forward contracts") and do not fall within the purview of the CEA. On the other hand, contracts for the sale of a commodity for future delivery, referred to as "futures contracts," are regulated by the CEA and fall under the plenary jurisdiction of the Commodity Futures Trading Commission.

Since the parties had not briefed this issue in their original submissions, the Court requested supplemental memoranda. In addition, the Court invited amicus curiae briefing from other interested parties. From that invitation, the Court received amici from a group of farmers and producers who are involved in similar disputes with another elevator and agricultural cooperative, a group of farmers and producers who are involved in a related dispute with Grain Land and others, and Third–Party Defendant Farmers Com-

modities Corporation, who is not an active participant in the present motion. The Court heard oral arguments on this supplemental issue on July 16.

Having considered the submissions and presentations of the parties and amici, the Court is prepared to rule on the Motion for Partial Summary Judgment. The bases for jurisdiction over these controversies is 28 U.S.C. §§ 1331, 1337, 1367, and 2201. Accordingly, the Court now turns its attention to resolving the issues raised in the motion.

## DISCUSSION

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.* 980 F.2d 1217, 1219–20 (8th Cir.1992). The Court determines materiality from the substantive law governing the claim. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material. *See id.* A material fact dispute is "genuine" if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party. *See id.* at 248–49, 106 S.Ct. at 2510–11. The Court reviews the present motion with these standards in mind.

### A. The Commodity Exchange Act

In bringing its motion for partial summary judgment, Grain Land seeks dismissal of a number of the claims alleged in the Producers' master pleadings. As mentioned, the Court concluded that it was necessary to consider a preliminary issue before reaching the substance of the motion. Specifically, the Court must determine whether the HTA contracts are off-exchange futures contracts prohibited under the CEA or whether the contracts are cash forward contracts falling within the exclusion that expressly exempts them from the reach of the CEA. In their master pleadings, both sides seek declaratory judgments as to the applicability of the CEA to the contracts in question. This issue must be addressed first as it is the proverbial "fork in the road" with respect to the disposition of the other counts that are the focus of the summary judgment motion. A finding that the HTAs are futures contracts subject to the CEA would channel this litigation down the road of federal regulation. Alternatively, if the HTAs are forward contracts exempted from the CEA, then this litigation is properly resolved in the context of state contract law.

The Producers contend that Grain Land was engaging in futures commodities contracts in violation of the CEA by offering and executing contracts for the sale of grain for future delivery outside of a licensed contract market. The Commodity Exchange Act requires that transactions in commodity futures contracts occur only on or subject to the rules of a board of trade that has been designated by the Commodity Futures Trading Commission ("the Commission" or "the CFTC") as a contract market. *See* 7 U.S.C. § 6(a). The Act vests in the Commission regulatory jurisdiction over futures contracts, i.e., contracts of sale of a commodity for future delivery. *Id.* § 2(i). Expressly excluded from such contracts, and therefore regulation under the Act, are those contracts that involve the "sale of any cash commodity for deferred shipment or delivery." *Id.* § 1a(5)(11). This exemption is commonly referred to as the "forward contract exclusion."

With respect to this issue, the task before the Court is twofold. First, the Court must determine whether the HTA contracts are cash forward contracts for deferred shipment or delivery. *See CFTC v. Co Petro Mktg. Group, Inc.* 680 F.2d 573, 576–79 (9th Cir. 1982). In other words, it must determine whether the contracts fit within the forward contract exclusion. Second, if the HTAs do not fit within the exclusion, then the Court must decide whether the contracts are futures contracts as the term is used by the Act. *Id.* at 579–81. Complicating the Court's inquiry is the fact that the CEA does not define the terms "deferred shipment or delivery" or "future delivery." With no clear guidance from the face of the statute as to distinguishing excluded forward contracts from regulated futures contracts, a review of

legislative history is appropriate to ascertain Congress's intent. *See id.* at 577 (citing *United States v. Turkette* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)).

The cash forward contract exclusion finds its origin in the Future Trading Act of 1921, Pub.L. No. 67–66, § 2, 42 Stat. 187 (1921). Congress enacted the Future Trading Act in an effort to curb excessive speculation and price manipulation on the grain futures markets. The Act imposed a prohibitive tax on all commodities contracts for future delivery, with two exceptions: (1) contracts made by owners or growers of grain, by owners or renters of land on which the grain is grown, or associations of such persons; and (2) contracts traded by or through members of boards of trade designated by the Secretary of Agriculture as contract markets. From its terms, the purpose of the Future Trading Act was clear: "Congress endeavored to force all futures transactions, as opposed to cash-deferred future delivery transactions, onto regulated contract markets, which, as a result of government oversight, were to be free from manipulations and other market disturbances." *In re Stovall,* C.F.T.C. No. 75–7, Comm. Fut. L. Rep. (CCH) ¶ 20,941, at 23,780 (Dec. 6, 1979). In an effort to quell concern that the exclusion for owners and growers was too narrow and might not exempt from the tax legitimate transactions between farmers and grain elevators, language was added excluding "any sale of cash grain for deferred shipment or delivery." *See Co Petro,* 680 F.2d at 577 & n. 4 (quoting Senate and House reports).

The Future Trading Act was declared unconstitutional as an impermissible attempt at regulation through the taxing power. *See Hill v. Wallace,* 259 U.S. 44, 69, 42 S.Ct. 453, 458, 66 L.Ed. 822 (1922). In response, Congress quickly enacted the Grain Futures Act, Pub.L. No. 67–331, 42 Stat. 998 (1922), pursuant to its commerce clause powers. In it, the forward contract exclusion was retained without change. *See* § 2. "That Act was clearly intended to accomplish the same legislative purpose as the 1921 Act with no material change in its regulatory provisions." *Stovall,* ¶ 20,941, at 23,781.

In 1936, Congress passed the Commodity Exchange Act, Pub.L. No. 74–675, 49 Stat. 1491 (1936). The enactment expanded the scope of federal regulation by including additional commodities beyond grain. *See* § 3. In keeping with this broadened scope, it also changed the language of the forward contract exclusion to exempt from regulation *"any cash commodity* for deferred shipment or delivery," § 2 (emphasis added), and deleted the language referring to owners and growers of grain, owners and renters of land, and associations of such persons. The deleted matter was considered redundant in light of the protections in section 2. *See Co Petro,* 680 F.2d at 578 (citing H.R.Rep. No. 74–421, at 4–5 (1935)). Despite subsequent amendments to the CEA since its enactment, the forward contract exclusion has not changed. As one court aptly summarized, the history of the forward contract exclusion reveals that

> [t]here is no indication that Congress drew this exclusion otherwise than to meet a particular need such as that of a farmer to sell part of next season's harvest at a set price to a grain elevator or miller. These cash forward contracts guarantee the farmer a buyer for his crop and provide the buyer with an assured price. Most important, both parties to contracts deal in and contemplate future delivery of the actual grain.

*Id.* at 577–78.

Based on this review, the Court concludes that the HTA contracts in this case fit within the forward contract exclusion. While the scope of the exclusion is narrow, its purpose is fulfilled by the contracts at issue here. Grain Land only entered into these contracts with farmers and producers of grain. Each of the Producers was in the business of growing grain and had the ability to make delivery on the contracts. In addition, Grain Land was in the business of obtaining grain under contracts for resale and relied on actual delivery of it to carry on its business. Grain Land also had the capacity to take delivery of the grain subject to the HTAs. On their face, the contracts were clearly grain marketing instruments, a tool to accomplish the actual delivery of grain in exchange for money. This underlying pur-

pose is further corroborated by the undisputed fact that delivery and payment routinely occurred. For example, millions of bushels of grain were delivered on the contracts and, of the 2341 HTA contracts executed by Grain Land members, only twelve contracts were canceled. In short, these principal characteristics of the HTA contracts exemplify what Congress intended to exclude from the CEA. Accordingly, the Court holds that the forward contract exclusion, 7 U.S.C. § 1a(5)(11), is available for cash contracts for the sale of grain that are made between persons engaged in the grain business and that are predicated on the expectation of actual, albeit deferred, delivery. *See id.* at 579 (citing *Stovall*, ¶ 20,941, at 23,778).

The Court's analysis is confirmed by relevant adjudications and regulations involving the forward contract exclusion. While no court has confronted the precise issue presented in this litigation, at least one court has addressed the CEA's forward contract exclusion in similar contexts. In *CFTC v. Co Petro Marketing Group, Inc.*, the Ninth Circuit Court of Appeals affirmed a district court's judgment that a licensed gasoline broker, Co Petro, was offering and selling futures contracts. 680 F.2d at 576. As part of its business, Co Petro bought and resold in the spot market a large volume of gasoline and diesel fuel monthly. In addition to its direct sales of gasoline, Co Petro offered and sold contracts for the future purchase of petroleum products pursuant to what it termed an "Agency Agreement for Purchase and Sale of Motor Vehicle Fuel." The agreements, which were marketed to the general public, obligated the customer (1) to appoint Co Petro as his agent to purchase a specified quantity and type of fuel at a fixed price for delivery at an agreed future date, and (2) to pay a deposit based on a percentage of the purchase price. The agreements did not require the customer to take delivery of the fuel, but instead, permitted the customer to appoint Co Petro to sell the fuel for him at a later date. The customer would profit from the transaction if the cash price had risen in the interim, but stood to lose money if the converse occurred. Any losses, however, were capped by a liquidated damages clause providing that the customer could lose no more than ninety-five percent of his deposit.

In its holding, the court stated that the forward contract exclusion "is unavailable to contracts of sale for commodities which are sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." *Id.* at 579. The decision hinged on several key facts: (1) Co Petro's agency agreements were marketed to the general public, (2) Co Petro entered into the agreements predominantly with speculators from the general public, (3) the underlying petroleum products had no "inherent value" to these speculators, and (4) the speculators had neither the intention of taking delivery nor the capacity to do so. *Id.* at 578.

The Ninth Circuit recently addressed the forward-contract-exclusion issue again in *CFTC v. Noble Metals International, Inc.* 67 F.3d 766 (9th Cir.1995), *cert. denied*, — U.S. —, 117 S.Ct. 64, 136 L.Ed.2d 26 (1996). There, the CFTC brought an action against various corporate and individual defendants who offered and sold contracts for the purchase and sale of precious metals to members of the general public. For a fifteen percent "administrative fee," customers obtained the right and obligation to make or take delivery of specified quantities of precious metals at a price established at the time of contract formation. The defendants arranged to have certain companies act as third-party agents to receive and take delivery of the metals on behalf of the customers. While a customer received legal title in the precious metals, the customer would sell the commodity to these third-party agents instead of taking delivery themselves. Thus, in reality, no actual metals ever changed hands. The agents would sell the metals back to the defendants and receive a fee and the customers would receive proceeds from the sale.

In holding that the contracts sold were futures contracts regulated by the CEA, the court again attempted to distinguish between forward and futures contracts. *Id.* at 772–73. Relying on its decision in *Co Petro*, the

court reasserted that the forward contract exclusion is unavailable for " 'contracts of sale for commodities sold merely for speculative purposes and which are not predicated upon the expectation that delivery of the actual commodity by the seller to the original contracting buyer will occur in the future.' " *Id.* at 772 (quoting *Co Petro,* 680 F.2d at 579). Focusing particularly on the exclusion's delivery requirement, the court explained

> To take advantage of the cash forward contract exclusion under the Act, the delivery requirement cannot be satisfied by the simple device of a transfer of title. As we said in *Co Petro,* "a cash forward contract is one in which the parties contemplate physical transfer of the actual commodity." *Co Petro,* 680 F.2d at 578. If this were not so, the cash forward contract exception would quickly swallow the futures contract rule.

*Id.* Thus, despite the "self-serving labels" that the defendants had given the contracts, the court concluded that there was no legitimate expectation that the customers would take actual delivery of the purchased metals. *Id.* at 773.

Beyond the *Co Petro* and *Noble Metals* decisions, the forward contract exclusion has also been the subject of an administrative agency adjudication. In the case of *In re Stovall,* the CFTC determined that the respondent had engaged in the sale of futures contracts apart from a designated contract market. *Stovall,* ¶ 20,941, at 23,776–77. Stovall was a floor broker and member of two Chicago-based exchanges. The Commission found, among other things, that Stovall had "bucketed" customer orders; which is to say, Stovall took the opposite side of customers' orders into his own account or into an account in which he had an interest, with no intention of bona fide execution. *Id.* ¶ 20,-941, at 23,776. After making initial deposits with Stovall, clients would exercise no control over their accounts. *Id.* ¶ 20,941, at 23,778. None of the clients interviewed for the purposes of the action were interested in acquiring or disposing of actual cash commodities. *Id.* In addition, the clients were not aware of the type or amounts of commodities pur-

chased and sold for their accounts until Stovall sent them statements. *Id.* Moreover, of all the contracts executed, only one resulted in actual delivery of the pledged commodity. *Id.*

In reaching its ultimate conclusion that the contracts were futures contracts, the CFTC noted that it had "considered whether the Stovall transactions fell within the [forward contract exclusion]." *Id.* ¶ 20,941, at 23,777. After a brief review of the legislative history relevant to the exclusion, the Commission stated that

> the "cash commodity" exclusion was intended to cover only contracts for sale which are entered into with the expectation that delivery of the actual commodity will eventually occur through performance on the contracts. The seller would necessarily have the ability to deliver and the buyer would have the ability to accept delivery in fulfillment of the contract. Although the desire to acquire or dispose of a physical commodity is the underlying motivation for entering such a contract, delivery may be deferred for purposes of convenience or necessity.

*Id.* ¶ 20,941, at 23,777–78. The Commission further noted that a "major difference" between forward and futures contracts is that the former "entails not only the legal obligation to perform, but also the generally fulfilled expectation that the contract will lead to the exchange of commodities for money." *Id.* ¶ 20,941, at 23,778. Parties to futures contracts, however, "do not usually expect delivery and it rarely occurs." *Id.* In light of the circumstances, the CFTC determined that the Stovall transactions were "not the contracts Congress had in mind when it carved the cash commodity exclusion out of the requirements of the Act." *Id.*

In the actions at bar, the HTA contracts are markedly different from the infirm transactions in *Co Petro, Noble Metals,* and *In re Stovall.* None of the fatal flaws found in these cases are present here. The HTA contracts were made between Grain Land and the Producers, who were both in the grain business. In addition, the grain was of inherent value to both parties to the contract—the Producers grew the grain and

Grain Land bought and resold it. Moreover, the Producers received cash payment on the contracts only upon delivery of the actual commodity. Finally, it is clear that the parties intended that delivery be tendered and accepted based on the contracts' plain terms and the parties' undisputed past dealings.

In further support of the Court's conclusion, the CFTC has acknowledged the same characteristics as being fundamental to contracts falling within the forward contract exclusion. See Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 Fed.Reg. 39,656, 39,657–58 (CFTC Sept. 30, 1985) [hereinafter "Interpretative Statement"] (summarizing salient characteristics of forward contracts). In the Interpretive Statement, the Commission noted that for a particular contract to qualify as a forward contract, "the contract's terms and the parties' practice under the contract [must] make clear·that both parties to the contracts deal in and contemplate future delivery of the actual commodity." Id. at 39,657 (quoting Co Petro, 680·F.2d at 578) (quotations omitted). Moreover, the CFTC stated

> First, the contract must be a binding agreement on both parties to the contract: one must agree to make delivery and the other to take delivery of the commodity. Second, ·because forward contracts are commercial, merchandizing transactions which result in delivery, the courts.and the Commission have looked for evidence of the transactions' use in commerce. Thus, the courts and the Commission have examined whether the parties to the contracts are· commercial entities that have the capacity to make or take delivery and whether delivery, in fact, routinely occurs under such contracts.
>
> Forward contracts frequently are not standardized. Contract terms are often negotiated, particularly grade, ·delivery point and settlement date. Even in those instances when contract terms are standardized by a single contracting party, certain terms may nonetheless be left open to negotiation.

Id. at 39,657–58 (footnotes omitted). These essential characteristics outlined by the Com-mission are present in the HTA contracts here, reaffirming the Court's conclusion. See also Statutory Interpretation Concerning Forward Transactions, 55· Fed.Reg. 39,188 (CFTC Sept. 25, 1990) (finding crude oil contracts executed by commercial participants excluded from Commission's regulatory jurisdiction).

In opposition, the Producers challenge various aspects of the HTA contracts contending that certain features make the contracts overly speculative and, therefore, take them outside the scope of the exclusion. Of most significance, the Producers focus their attention on the contracts' hedging, pricing, and delivery terms. Moreover, in support of their position, the Producers rely heavily on a recent statement of guidance issued by the CFTC's Division of Economic Analysis ("DEA") pertaining to HTA contracts. See Division of Economic Analysis Statement of Policy in Connection with the Unwinding of Certain Existing Contracts For the Delivery of Grain and Statement of Guidance Regarding Certain Contracting Practices, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,691, at 43,852 (CFTC May 15, 1996) [hereinafter "Guidance Statement"]. The Court addresses these concerns in turn.

The Producers claim that the hedging and delivery terms of the HTAs introduce an inordinate degree of speculativeness into the contracts. Specifically, the Producers claim that hedging is impossible since the HTAs ·have no definitive delivery requirements. The agreement requires Grain Land to maintain hedge positions on a duly licensed board of trade for the grain under contract with the Producers. The contracts read: "Buyer [Grain Land] confirms the following futures transaction was made for Seller [Producer] today on the Chicago Board of Trade." This hedging requirement calls for Grain Land to establish short positions on the CBOT in amounts equal to the total bushels of grain that are subject to contract. If the Producer elects to roll delivery, then Grain Land must satisfy the old hedge and take a new short position that corresponds to the new futures reference price in the HTA. Therefore, by adjusting the hedge transaction each.time a

delivery roll occurs, the contracts remain hedged.

The Producers also contend that the contracts lack a delivery requirement by permitting indefinite rolling. This feature, they argue, disengages the contract price from the economic value of the grain being grown and directly contradicts the "actual delivery" requirement inherent to the forward contract exclusion. The Court takes issue with the Producers' conclusions. While the HTAs' rolling feature may have introduced imprudent risk in hindsight, it does not fatally detract from the instruments' principal purpose. As discussed above, the contracts on their face contemplate the cash sale of grain for deferred delivery. In addition, over the three years that Grain Land offered and the Producers used these contracts, millions of bushels of grain were actually delivered without incident. The same observations apply with equal force to the inclusion of a cancellation provision in the contracts. Cancellation was not accomplished through an offsetting transaction, but was effected by agreement between the parties to the original contract. Moreover, the parties' undisputed past practices, which included only twelve cancellations, confirm the HTAs' fundamental nature as a grain marketing tool. Finally, and of particular significance, a Producer received no cash payment until he delivered the grain subject to contract.

The Producers also argue that the contracts lack specificity as to the price term. The Court does not agree. The HTAs provide the mechanics for setting the cash price, which is determined by two components: reference price and basis. The reference price is set at the time the contract is executed by utilizing the futures price on the CBOT for the futures month corresponding to delivery. The Producer can establish basis at a time prior to delivery. If the Producer chooses to roll the delivery date to a later month, then a corresponding change occurs in the reference price which includes the attribution of any positive or negative difference between the old and new reference prices and a fee charge of two cents per bushel. The Court concludes that this pricing mechanism is ade-quately specific for the purpose of establishing the HTAs' cash price.

■ Finally, the Court finds that the Producers' heavy reliance on the CFTC's May 1996 Guidance Statement is misplaced. Agency statements of guidance are not law. Defining statutory terms is clearly within the province of the judiciary when, as here, the terms are ambiguous. *See United States v. Was*, 684 F.Supp. 350, 352 (D.Conn.1988) (citing *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837–38, 25 L.Ed.2d 192 (1970)). Moreover, the Commission itself described the Guidance Statement in reserved terms, stating that it explained the DEA's "views on the application of the principles of prudent risk-reduction to the structure of HTA contracts." CFTC's Division of Economic Analysis Issues Statements of Policy and Guidance Relating to "Hedge–to–Arrive" Contracts, No. 3911–96 (May 15, 1996). In the Guidance Statement, the DEA acknowledged that it was not taking a position as to the legality of any individual contract. Thus, while the principles set forth by the DEA may be helpful and informative to future parties in minimizing contractual risk, the Guidance Statement is of no value to this Court in its present inquiry.

In short, the Court concludes that the HTA contracts are forward contracts excluded from regulation under the CEA. While some of the characteristics of these contracts differ from more traditional cash forward instruments, their essential terms plant them firmly within the narrow scope of the exclusion. Based on this conclusion, the Court does not delve into the second-tier inquiry of whether the HTA contracts are futures contracts. A contract that qualifies for the forward contract exclusion cannot be a futures contract. *See Co Petro*, 680 F.2d at 579. Accordingly, the Court grants the motion for summary judgment on this issue and dismisses Count I of the Producers' complaint.

## B. Other Claims Dependant on the Commodity Exchange Act

The Producers' pleadings include two additional counts directly premised on the HTA contracts falling within the regulatory purview of the CEA. Specifically, the Producers

allege fraud on the contracts in violation of 7 U.S.C. § 6b and seek rescission of the contracts (Count II) or, alternatively, damages (Count III). In addition, the Producers assert a claim for breach of· fiduciary duty against Grain Land, Christensen, and Burke (Count IX). As to Christensen and Burke, the Producers base the existence of a fiduciary duty on the theory that these individuals were acting as brokers with respect to the HTA contracts. (*See* Pls.' Mem. at 28.) This contention, however, hinges on a finding that the HTAs are futures contracts subject to the regulatory scheme of the CEA. In light of the Court's determination that the contracts are not governed by the Act, Grain Land, Christensen, and Burke are entitled to summary judgment with respect to the two CEA-based fraud counts. Moreover, Christensen and Burke are entitled to judgment on the Producers' claim for breach of fiduciary duty. Consequently, the Court grants the parties' motion ·and dismisses Count II and Count III of the Producers' master complaint as to all parties and dismisses Count IX as to Christensen and Burke.

### C. State Law Claims

Grain Land, Christensen, and Burke also seek summary judgment as to several state law claims. Based on theories discussed more fully below, the parties move for summary judgment on the Producers' claims for breach of contract, common law fraud, fraudulent misrepresentation seeking damages, and negligent misrepresentation.

#### 1. Jurisdiction

As a preliminary matter, the Court must determine whether it is proper to exercise jurisdiction over the remaining state law claims. When federal claims that comprise part of a lawsuit drop out, the district court has discretion to retain or dismiss the pendent local law claims. *See Kansas Pub. Employees Retirement Sys. v. Reimer & Koger Assocs., Inc.* 61 F.3d 608, 611 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 915, 133 L.Ed.2d 845 (1996). This discretionary authority is found in the language of 28 U.S.C. § 1367(a), which states in relevant part,

> in any civil action· of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Since the remaining claims here are "so related," the Court finds that it is appropriate to retain jurisdiction over them.

#### 2. Election of Remedies

Grain Land, Christensen, and Burke seek summary judgment as to the damages aspect of the Producers' claims for breach of contract (Count IV), common law fraud (Count ·V), fraudulent or material misrepresentation (Count VII), and negligent misrepresentation (Count VIII) on the theory that the Producers have elected the remedy of rescission by refusing to perform on the HTA contracts. The Court does not agree. The doctrine of election of remedies is " '[a] confusing congeries of doctrines [that] have been lumped together.' " *Kansas State Bank v. Citizens Bank,* 737 F.2d 1490, 1498 (8th Cir.1984) (quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4476, at 772 (1981)). The doctrine manifests itself in three primary applications: (1) requiring a party to "choose among cumulative statutory or common law rights"; (2) preventing "double recovery for a single injury"; and (3) preventing "parties from pleading inconsistent theories of relief." *Id.* at 1498–99.

As argued at this stage of the proceedings, the only basis for the movants' use of the doctrine is to prevent the Producers from pleading inconsistent or alternative theories of relief. That application, however, "has been eviscerated by the permissive rules of pleading under Fed.R.Civ.P. 8(a) and 8(e)(2)." *Id.* . at 1499. ·Moreover, Grain Land, Christensen, and Burke have not been substantially prejudiced and there is little chance of double recovery. *See Lear v. Equitable Life Assurance Soc'y of the United States,* 798 F.2d 1128, 1134 (8th Cir.1986). Accordingly, the Court denies the motion as to these counts on the proffered theory of election of remedies.

### 3. Economic Loss

In addition, the movants seek summary judgment as to the Producers' claims for common law fraud (Count V), fraudulent or material misrepresentation (Count VII), and negligent misrepresentation (Count VIII) on the theory that they are barred by the economic loss doctrine. The Minnesota Supreme Court fashioned the doctrine "to clarify the murky lines between remedies in contract, in tort and under the U.C.C. [Uniform Commercial Code] in cases resulting from commercial transactions." *Nelson Distrib., Inc. v. Stewart–Warner*, 808 F.Supp. 684, 686 (D.Minn.1992). In *Superwood Corp. v. Siempelkamp Corp.* 311 N.W.2d 159, 162 (Minn.1981), the supreme court held that "economic losses that arise out of commercial transactions, except those involving personal injury or damage to other property, are not recoverable under the tort theories of negligence or strict products liability." As the bases for its decision, the court noted

> The recognition of tort actions in the instant case would create a theory of redress not envisioned by the legislature when it enacted the U.C.C. Furthermore, tort theories of recovery would be totally unrestrained by legislative liability limitations, warranty disclaimers and notice provisions. To allow tort liability in commercial transactions would totally emasculate these provisions of the U.C.C. Clearly, the legislature did not intend for tort law to circumvent the statutory scheme of the U.C.C.

*Id.* The court revisited the doctrine in *Hapka v. Paquin Farms*, 458 N.W.2d 683 (Minn. 1990), when it overruled the *Superwood* exception and held that the U.C.C. provides exclusive remedies with respect to damages arising from commercial transactions which involve property damage only. *Id.* at 688. The court took pains to distinguish commercial transactions from consumer transactions, stating that it "continued to regard the Code remedies as something less than adequate in the ordinary consumer transaction." *Id.* In particular, the court noted that "a consumer has neither the skill nor bargaining power to negotiate either warranties or remedies," but

that "the law is entitled to expect the parties to commercial transactions to be knowledgeable and of relatively equal bargaining power so that warranties can be negotiated to the parties' mutual advantage." *Id.* Two years later, the court further refined the doctrine in *Lloyd F. Smith Co. v. Den–Tal–Ez, Inc.*, 491 N.W.2d 11 (Minn.1992). There, the supreme court sharpened the focus of the inquiry by clarifying the guiding principle underlying the *Hapka* decision. Specifically, the decision addressed the commercial transaction/consumer transaction dichotomy, holding that

> the U.C.C. provides the exclusive remedy for other property damages arising out of a sale of goods only when that sale fits *Hapka's* narrow definition of a "commercial transaction," *i.e.*, where the parties to the sale are dealers in the same goods or, to use a more precise term, "merchants in goods of the kind."

*Id.* at 17.

■ With this backdrop, the Court concludes that the Producers' tort claims are proscribed by the economic loss doctrine. The HTA contracts at issue are commercial contracts for the sale of goods that fall squarely within the purview of the U.C.C. Moreover, the Producers here are undoubtedly merchants for purposes of the U.C.C. *See, e.g., Thofson v. Redex Indus., Inc.*, 433 N.W.2d 901 (Minn.Ct.App.1988) (finding farmers to be "merchants" for purposes of U.C.C.). Specifically, the parties indisputably deal in the "goods of the kind," i.e., grain. Minn.Stat. § 336.2–104(1). While the Minnesota Supreme Court has not directly applied the economic loss doctrine to claims for fraud and misrepresentation, the broad language in *Hapka* demonstrates that the court is "concerned as much with the exclusivity of the U.C.C.'s remedies as it is with the particular tort theories." *Nelson Distrib.*, 808 F.Supp. at 687–88 (applying economic loss doctrine to claim of fraudulent misrepresentation); *see also Upsher–Smith Lab. v. Mylan Lab., Inc.* 944 F.Supp. 1411, 1434–36 (D.Minn.1996) (applying economic loss doctrine to intentional misrepresentation). Consequently, this Court determines that the Producers' claims for common law

fraud, fraudulent or material misrepresentation, and negligent misrepresentation are barred.

In opposition, the Producers maintain that Grain Land, Christensen, and Burke misconstrue the allegations in the affected counts. Each of these claims, they argue, alleges fraud or negligence in the inducement of the HTA contracts, not in their breach. In support of their argument, the Producers rely on case law that permits separate claims for breach of contract and fraud in the inducement in contexts that do not implicate the U.C.C. *See McDonald v. Johnson & Johnson,* 776 F.2d 767 (8th Cir.1985) (involving corporate acquisition agreement); *E.H. Boerth Co. v. LAD Properties,* 82 F.R.D. 635 (D.Minn.1979) (involving contract for securities underwriting of limited partnership units in real estate project); *Clements Auto Co. v. Service Bureau Corp.* 298 F.Supp. 115 (D.Minn.1969) (involving contract for data processing services); *Brooks v. Doherty, Rumble & Butler,* 481 N.W.2d 120 (Minn.Ct. App.1992) (involving employment contract). Here, however, the HTAs were contracts coming within the scope of the U.C.C. The cited cases are simply inapposite to the situation at bar involving contracts for the sale of goods. Since the economic loss doctrine bars the tort claims asserted by the Producers, the Court grants the movants' request and dismisses Counts V, VII, and VIII.

**CONCLUSION**

Hindsight is not a luxury afforded to those living in the present. It is now obvious that the unique features of the HTA contracts introduced additional risk into the parties' transactions; indeed, more risk than that found in other marketing instruments utilized in the grain marketing business. While those risks may be characterized as imprudent, that observation does not alter the essence of these contracts. The HTA contracts are forward contracts that contemplate the actual delivery of grain and executed by parties with the capacity to produce the commodities and fulfill the contractual requirements. Based on these observations, the Court concludes that the HTAs are not subject to regulation under the CEA. Therefore, the Court grants judgment as a matter of law as to Count I, Count II, Count III, and Count IX (as to Christensen and Burke) of the Producers' complaint, all of which are dependent upon a finding that the CEA controls in this case. Moreover, the Court finds that the doctrine of election of remedies is inapposite and denies the motion to the extent that it is brought on that theory. The Court does, however, grant summary judgment with respect to those claims subject to the economic loss doctrine. The Court determines that the HTA contracts are contracts for the sale of goods and that the parties are merchants that deal in the goods of the kind. Therefore, the Court finds that the Producers' tort claims are barred by the exclusivity of the U.C.C.

Accordingly, **IT IS HEREBY ORDERED** THAT:

1. Grain Land Coop's Motion For Partial Summary Judgment (Clerk Doc. No. 40) is GRANTED IN PART and DENIED IN PART;

2. Count I of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED;

3. Count II of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED;

4. Count III of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED;

5. Count V of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED;

6. Count VII of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED;

7. Count VIII of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED; and

8. Count IX of the Producers' complaint (Clerk Doc. No. 11) is DISMISSED as to Michael Christensen and Joseph Burke.