**THE ANDERSONS, INC., Plaintiff,**

v.

**Rex M. CROTSER, Defendant.**

**No. 1:97–CV–593.**

United States District Court,
W.D. Michigan,
Southern Division.

April 2, 1998.

Stephen S. Muhich, Dykema Gossett P.L.L.C., Grand Rapids, MI, for Plaintiff.

Richard C. Krause, Krause, McCarthy & Associates, P.C., East Lansing, MI, for Defendant.

## OPINION

QUIST, District Judge.

Plaintiff The Andersons, Inc. ("The Andersons") filed this action under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–307, to compel arbitration of a contract dispute with Defendant Rex M. Crotser ("Crotser"). Crotser counterclaimed for compensatory and punitive damages arising from The Andersons' alleged violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–26. The Andersons has now moved for summary judgment on all issues.

### Facts

The Andersons operates grain elevators for the purpose of buying, storing, and selling grain. One of The Andersons' suppliers was Crotser, a grain producer who entered multiple contracts with The Andersons over a period of several years. The parties entered eight "Hedge–To–Arrive" ("HTA")[1] contracts for Crotser's 1995 crop of corn. (See Pl.'s Exs. B–I.)

On June 18, 1995, after having entered six of his eight contracts with The Andersons, Crotser entered a separate contract with a seed company, Cargill, Inc. ("Cargill"), to use his land to grow corn from Cargill's seed, a crop to which Crotser would not have title at any point. (See Pl.'s Br.Supp.Ex. J.) Crotser performed under the Cargill contract rather than under his contract with The Andersons.

The Andersons sought to arbitrate its dispute with Crotser pursuant to a provision that "any disputes or controversies arising out of this contract shall be arbitrated by the National Grain & Feed Association, pursuant to its arbitration rules." (Standard Purchase Contract Terms ¶ 13.b., Pl.'s Br.Supp.Ex. B.) When Crotser refused, The Andersons filed this action to compel arbitration under the FAA. Crotser raises formation defects, the institutional bias of the National Grain and Feed Association ("NGFA"), and alleged violations of the CEA in defense.

### Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *Id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *Id.* at 251, 106 S.Ct. at 2511 (citing Schylkill and Dauphin *Imp. Co. v. Munson*, 81 U.S.(14 Wall.) 442, 448, 20 L.Ed. 867 (1871)).

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *Celotex Corp.*

---

1. The court in *Eby v. Producers Co–op, Inc.*, 959 F.Supp. 428 (W.D.Mich.1997) aptly summarized the relevant features of HTA contracts as follows:

> In a basic HTA, the farmer and elevator enter a contract for the sale of a fixed number of bushels of grain for delivery at a particular time in the future. The futures reference price, the price per bushel on a contract market for a particular type of grain during certain futures months, is fixed, while the basis, a local adjustment to the per bushel price that reflects local variables, floats until it is fixed by the farmer before delivery. If the farmer does not set the basis by a specified time, the basis is automatically set by the terms of the HTA. In order to eliminate the risk of change in the futures reference price, the elevator hedges its contract with the farmers. The elevator accomplishes this by establishing a short futures position, an equal and opposite position, in the futures market.
>
> Certain HTAs ... allow the farmer to roll the delivery date to sometime in the future. When the HTA is rolled, the elevator buys back the futures hedge and rehedges by selling a new futures contract. The spread between the bought back and sold futures is attached to the price per bushel of the original HTA. This change could be either a debit or a credit. The farmer runs the risk of having this spread run against him.

*Id.* at 430 n. 1.

v. Catrett, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. Id.; Frank v. D'Ambrosi, 4 F.3d 1378, 1384 (6th Cir.1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 236 (6th Cir.1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## Analysis

### 1. General Contract Defects

Crotser alleges the following general contract defects: (1) a disparity in bargaining power leading to an economically oppressive environment at formation; (2) the unconscionability of the agreement; and (3) the institutional bias of the NGFA as an arbitrator.

■ The record shows that Crotser makes these allegations with regard to the entirety of the contracts at issue, rather than only with regard to the arbitration clauses contained in those contracts. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), the Court held that "if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." Id. at 403–04, 87 S.Ct. at 1806 (footnote omitted). The Sixth Circuit has since held that "although the Prima Paint case involved a claim of fraudulent inducement, the rule the court announced was more general: when the issues in dispute do not involve the making or the performance of the section 3 arbitration clause itself, the agreement's arbitration clause is enforced and the parties' dispute must be submitted for resolution by arbitration." C.B.S. Employees

Fed. Credit Union v. Donaldson, Lufkin & Jenrette Securities Corp., 912 F.2d 1563, 1567–68 (6th Cir.1990); accord Rollins, Inc. v. Foster, 991 F.Supp. 1426, ——, 1998 WL 25702, at *3 (M.D.Ala.1998) (mem.op.). Therefore, the Court finds that the alleged general contract defects are arbitrable.

### 2. CEA Violations

Crotser further argues that the arbitration clause fails to contain the boldface notification of rights required by the Commodity Futures Trading Commission ("CFTC"). See 17 C.F.R. § 180.3(b)(6). Courts have held that violations of these regulations render an arbitration clause unenforceable. See Felkner v. Dean Witter Reynolds, Inc., 800 F.2d 1466, 1468, 1470 (9th Cir.1986) (holding that failure to comply with 17 C.F.R. § 180.3(b) renders agreement to arbitrate void); In re Conticommodity Services, Inc. Securities Litig., No. H–86–4208, 1987 WL 10987, at *2, *5 (N.D.Ill. May 8, 1987) (mem. op.) (holding that failure to include boldface warnings, among other violations of § 180.3, rendered arbitration agreements null and void).

■ However, the applicability of the CFTC regulations turns on whether the Court finds that the contracts at issue were futures contracts subject to the CEA. The Andersons argues that it negotiated HTA contracts with Crotser which contemplated actual delivery of corn at a deferred date and which are specifically exempted from the CEA. See 7 U.S.C. § 1a(11) (excluding from definition of regulated contracts of sale of a commodity for future delivery "any sale of any cash commodity for deferred shipment or delivery"). Crotser's primary rebuttal is that the contracts were disguised futures contracts because they "had infinite rollover capacity and circumstances demonstrate that The Andersons did roll some of the contracts into different crop years." (Def.'s Resp. Br. at 7.)

In In Re Grain Land Coop, 978 F.Supp. 1267 (D.Minn.1997) (mem.op.), the court addressed the question of "whether the HTA contracts are off-exchange futures contracts prohibited under the CEA or whether the

contracts are cash forward contracts falling within the exclusion that expressly exempts them from the reach of the CEA," leaving open the possibility that the categories were not mutually exclusive. *Id.* at 1272. The court relied on the following factors in determining that the exclusion was applicable:

(1) both parties were in the grain business;

(2) "the grain was of inherent value to both parties" because one grew it and the other bought and resold it;

(3) cash payment occurred "only upon delivery of the actual commodity"; and,

(4) "the parties intended that delivery be tendered and accepted based on the contracts' plain terms and the parties' undisputed past dealings."

*Id.* at 1275–76; *see also* Characteristics Distinguishing Cash and Forward Contracts and "Trade" Options, 50 Fed.Reg. 39,656, 39,658 (1985) (stating that "the courts and the Commission have examined whether the parties to the contracts are commercial entities that have the capacity to make or take delivery and whether delivery, in fact, routinely occurs under such contracts").

*Grain Land* also held that contract terms allowing the producer to roll delivery did "not fatally detract from the instruments' principal purpose," where the parties had tendered and accepted actual delivery of millions of bushels of grain over a three-year period. 978 F.Supp. at 1277. The cancellation term did not affect the applicability of the exclusion because it "was not accomplished through an offsetting transaction, but was effected by agreement between the parties to the original contract." *Id.* Lastly, the pricing mechanism of fixing the futures reference price at execution but setting the basis component at some later date prior to delivery was "adequately specific for the purpose of establishing the HTAs' cash price." *Id.*

This Court finds the present case to be almost perfectly analogous to *Grain Land.* The Andersons presented unrebutted evidence that it took actual delivery from Crotser of approximately 850,000 bushels of grain over a five-year period. (Pl.'s Br.Supp.Ex. A.)

In addition, the contracts all provided "that the commodities represented under this contract will be tangibly exchanged" and that the Seller's "total net position outstanding for delivery shall not at any time exceed the total quantity owned, or expected to be owned, by Seller." (Flex®/Convertible® Contract Terms ¶ 2, Def.'s Resp.Br.Ex. 8.) The Court finds that the undisputed history of the parties' dealings and the plain meaning of the delivery requirements in the contracts demonstrate the parties' intent to tender and accept actual delivery of grain under the contracts at issue.

Furthermore, Crotser does not dispute several other facts which weigh in favor of the CEA exclusion. Crotser is in the business of growing corn and The Andersons is in the business of buying, storing, and selling corn. Like the contracts in *Grain Land, see* 978 F.Supp. at 1276, Crotser's contracts provided that "The Andersons will pay Seller any monies due when all of Seller's obligations under this contract are fulfilled." (Flex®/Convertible® Contract Terms ¶ 7, Def.'s Resp.Br.Ex. 8.) The cancellation provisions in this case were also similar to those in *Grain Land, see* 978 F.Supp. at 1277, in that they required disposition between the parties to the original transaction, rather than an offsetting transaction. (Standard Purchase Contract Terms ¶ 5, Def.'s Resp.Br.Ex. 8.) Finally, the pricing mechanism in this case was identical to that in *Grain Land. See* 978 F.Supp. at 1277.

Crotser rebuts the evidence of the parties' actual intent to tender and accept delivery with evidence that the contracts contemplated "yellow shell corn," (*see, e.g.,* Def.'s Resp. Br.Ex. 8), whereas he "produced only seed corn," (Def.'s Resp. Br. at 2). Crotser contends that since farmers who grow seed corn do not take legal or equitable title to their crops, which remains with the seed company, neither The Andersons nor Crotser expected Crotser to make actual delivery of any crop. The Andersons rebuts with undisputed evidence that "[t]he term '# 2 yellow corn' is descriptive of a certain United States Department of Agriculture ('USDA') quality

standard for corn. ·The qualities which seed corn possess [sic] will generally lead it to be classified as # 2 yellow corn under USDA standards." (Irmen Aff. ¶ 3, Pl.'s Reply Br. Ex. A.) It also presents unrebutted evidence that Crotser's contract with the seed company postdated six of the eight The Andersons contracts at issue in this case. (*See* Cargill Contract at 7, Def.'s Resp.Br.Ex. 6; Purchase Contracts, Pl.'s Br.Supp.Exs. B–I.) Therefore, The Andersons argues, rather than proving that his contracts with The Andersons were disguised futures contracts, Crotser merely shows that he breached six cash forward contracts with The Andersons by agreeing to use ·his land to grow crops over which he would have no title to convey to The Andersons. ·(*See* Flex®/Convertible® Contract Terms ¶ 2,· Def.'s Resp.Br.Ex. 8 (providing that "[s]eller further warrants that the total net position outstanding for delivery shall not at any time exceed the total quantity owned, or expected to be owned, by Seller")).)

Crotser further argues that the CEA exemption is not applicable because of the contracts' provision that "[u]npriced contracts will be rolled at Buyers [sic] discretion on or after the first notice day of the underlying futures option." (Def.'s Resp.Br.Ex. 8.) Crotser argues that this provision gave the contracts "infinite rollover capacity" within the meaning of *Eby v. Producers Co-op, Inc.,* 959 F.Supp. 428 (W.D.Mich.1997). *See id.* at 433 (holding that "potentially infinite rollovers are a factor in determining if the contract at issue violates the CEA" or instead "falls under the cash forward contract exclusion"). He cites evidence that The Andersons rolled forward the delivery date on contract numbers 24744, 24903, and 27600 and subsequently cancelled all three in October 1996. (*See* Def.'s Resp.Br.Ex. 9.) He then argues that this evidence "place[s] the instant case within the parameters set out in *Eby,* and leave[s] Plaintiffs [sic] with no ability to prove any set of facts that will disprove the reality of the roll-over, and the provision in the contract on which it was based." (Def.'s Resp. Br. at 7–8.)

The Court disagrees. Crotser fails to mention the additional contract term allow-ing amendment of the delivery period "only by prior mutual agreement between The Andersons and Seller, and subject to The Andersons' sole discretion." (Flex®/Convertible® Contract Terms ¶ 3, Def.'s Resp. Br.Ex. 8.) The Court finds that the requirement of mutual consent· to a rollover substantially limits the potential for "infinite" rollovers. In addition, *Eby's* holding was narrower than Crotser asserts. The court held only that an allegation of infinite rollovers was sufficient to defeat a 12(b)(6) motion to dismiss, *see* 959 F.Supp. at 433, not that evidence of the existence of rollovers was sufficient to defeat a motion for summary judgment in the face of rebuttal evidence on the issue of an actual delivery requirement.

Moreover, the Court finds that the evidence Crotser presented on the rollovers of contract numbers 24744, 24903, and 27600 is not probative of The Andersons' lack of intent to take actual delivery on those contracts. All three contracts are part of the 1995 crop year contracts which are the subject of this action. Crotser does not dispute his failure to deliver his 1995 crop to The Andersons under the contracts at issue. He states only that

> [f]or reasons that are unclear to me at the ·present time, my contracts with the [sic] Andersons were not closed out at the time that the delivery of my crop to the seed corn ·company was made. Instead, as I understand it, these contracts were rolled forward into new delivery months in 1996 by The Andersons. This was done without my permission.

(Crotser Aff. ¶ 6, Def.'s Resp.Br.Ex. 7.) The Andersons argues that it rolled the above contracts in order to allow Crotser to cover his obligations in part by delivering 1996 crop. (*See* Beier Dep. at 94–95, Def.'s Resp. Br.Ex. 5 (testifying that The Andersons was considering the possibility of allowing Crotser to cover his obligation on another of the 1995 contracts at issue, number 27537, with his 1996 North Carolina crop).)

Crotser further argues that the following testimony of William Beier ("Beier"), an employee of The Andersons, shows that The

Andersons never intended to create an actual delivery obligation:

A At the initial onset of when [Crotser] made contracts with The Andersons [the proportion of his 1,800 acres that he would devote to seed corn versus commercial corn] was not the critical issue, we wanted total corn production . . .[,] how many total acres of corn he was going to grow.

    *     *     *     *     *     *

Q You understood, though, didn't you, in May of '95 that if Rex Crotser was growing seed corn for Cargill that that corn would go directly to Cargill when it was harvested, wasn't that your understanding?

A It was production and delivery point was not at The Andersons but at Cargill Seed, that was normal, we buy grain all the time that's for delivery to other locations.

(*Id.* at 132, 134.) The Court finds that Beier's testimony is not inconsistent with the plain language of the delivery obligation in the contracts. At oral argument, The Andersons asserted that Beier was concerned only about the total acres of corn Crotser would grow because The Andersons was contracting to buy all of Crotser's crop. Beier was not concerned about what proportion of his land Crotser would devote to seed corn, as opposed to commercial corn, because the contracts provided that "[t]he delivery point may, at a fee to Seller, be amended only by prior mutual agreement between The Andersons and Seller" and that "[o]n convertible contracts, final settlement for any commodity must occur on or before pricing is made with another entity." (Flex®/Convertible® Contract Terms ¶¶ 3, 8, Def.'s Resp. Br.Ex. 8.) For those contracts listing The Andersons' White Pigeon facility as the delivery point, these provisions required Crotser to negotiate an amendment with The Andersons before escaping his actual delivery obligation. Likewise, for those contracts with convertible delivery points, these provisions required Crotser to settle his delivery obligation with The Andersons before entering an agreement with a third party for the same crop. The Court finds that these pro-

visions, on their face, rebut any inference that Beier did not expect Crotser to make actual delivery at the time The Andersons entered into the contracts at issue with Crotser, before Crotser entered into his agreement with Cargill.

### Conclusion

For the foregoing reasons, the Court will grant The Andersons' motion for summary judgment. The parties will arbitrate the underlying contract dispute, and the Court will dismiss Crotser's counterclaim in light of its finding that the contracts were not subject to the CEA.