# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3217

_____

| | | |
|---|---|---|
| Grain Land Coop; | * | |
| | * | |
| Plaintiff-Appellant; | * | |
| | * | |
| v. | * | |
| | * | |
| Kar Kim Farms, Inc.; Richard Ernest; | * | |
| Blane Amundson; Dwight Andersen; | * | |
| Crystal Andersen; Bruce Andersen; | * | |
| Darren Anderson; Gene Anderson; | * | |
| Joel Anderson; Bruce Annis; Dennis L. | * | |
| Becker; John Becker; Craig Beyer; | * | |
| Eldon Beyer; Mike Beyer; Bruce | * | Appeals from the United States |
| Blakesley; Donald Bleess; Morris | * | District Court for the |
| Blom; Paul B. Blom; Daniel Bonnett; | * | District of Minnesota. |
| Clyde Buendorf; Douglas Burgmann; | * | |
| David Burk; William L. Burk; Dean | * | |
| Caldwell; Joel Caldwell; Gary Caldwell, | * | |
| individually and doing business as | * | |
| Caldwell Farms; William Carr; | * | |
| Dahlstrom Agency; William Daly; | * | |
| Richard Dickman; Daniel Discoll; Mark | * | |
| Ristau, individually and doing business | * | |
| as Drisstau Farms; Drisstau Farms Plus; | * | |
| Patrick Ducanson; Karl Duncanson, | * | |
| individually and doing business as | * | |
| Duncanson Growers; Roger Dutton; Joel | * | |
| Eckhart; Donald Edberg; Ronald | * | |
| Erickson; Duwayne E. Evenson; Mark | * | |
| Fendrich; Marlin Fendrich; Todd | * | |
| Fenske; Heidi Fenske; Glen Frandle; | * | |

John S. Frandle, individually and doing business as Frandle Brothers; Steve Frederick; Dale Garvick; Ivan Gesche; Cary Goemann; Joel Goemann; Byron F. Goodrich; Gary Goodrich; Neil Granberg; Curtis Gronewald; Kenneth Haase; Harlan Hall; Brian Halverson; Bruce Halverson; Douglas Hankerson; Edna Hansen; Dennis Hanson; Morris Hanson, Jr.; Mark Hatteberg; Thomas Helgeson; Bruce Helland; Harvey Hislop; Scott Hislop, individually and doing business as Hislop Farms, Inc.; Dean Hoechst; Daniel Huper; Steve Huper; Tom Huper; Dean M. Johnson; Douglas Johnson; Elwood Johnson; Michael A. Johnson; Roger A. Johnson; Thomas Jones; Juergens Farms, Inc.; Ken Kaduce; Eugene Kaiser; Kevin Kaiser; Lawrence Kalis; Keller Farms, Inc.; David A. Kluender; Dale Koestler; Norman Kohlmeyer; Lawrence Landsteiner; Paul Landsteiner; James Landsteiner, individually and doing business as Landsteiner Farms; Elwood Langsev; Bruce Lawrence; Arlen S. Legred; Kevin Legred; Roger Legred; Thilmer M. Legred; Thomas Legred; Nathan Legred; Leland Enterprises, Ltd.; Gehard Leland; Gene Leland; Lee Manthei; Tim Manthei, individually and doing business as Manthei Brothers; Bruce Mauer; Neal Mensing; James A. Meyer; Sheldon E. Meyer; Ellen J. Molskness; Gerald Molskness; Andrew A. Monson; Erik Monson; Melvin Moore; Jason

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

Mortvedt; Oris Mortvedt; Jon Mutschler; Nelson Farms, Inc.; Richard W. Neinow Co.; Roger D. Nimz; Selmer Nordaas;

    Defendants;

Paul Obermeyer;

   Defendant-Appellee;

Carrol Olsen; Charles Olson; Claire Olson; Diane Olson; Orin J. Olson; Shawn Olson; Todd Olson; Wayne Olson; Robert Oren; Tim Oren, individually and doing business as Oren Brothers; Ronald Osmundson; Randy Oswald; Larry G. Paul; Jeff Peterson; John Pfaffinger; Georgianne Pfaffinger; Neil Rame; David Rennpferd; Fred Rennpferd, individually and doing business as Rennpferd Farms; Dennis Rollenhagen; Richard Rose; Steven Rose; Danny Rynearson; Dave Rynearson, individually and doing business as Rynearson Brothers; Thomas Sackett; Mark Sahr; David L. Sanders; Roger Schaper; Ron L. Schaper; Greg Schultz; Richard Schulz; George Shanahan; John Shanahan, individually and doing business as Shanahan Bros.; Roger Shirk; Steven Shirk; James Skogen; Glen Skogen, individually and doing business as Skogen Brothers; Don Slette; Sohn Dairy, Inc.; Dennis Sonnabend; Paul R. Sonnek; Robert Sonnek, Jr.; Randy

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

Steinhauer; Dennis Stenzel; Stevens Seed Farm, Inc.; Todd Stewart; Kurt Sylvara; Dan Timm; Newton P. Toland; Scott K. Volz; Ronald Wegner; Michael Wegner, individually and doing business as Wegner Farms and doing business as Wegson Farms; Dwight Weise; Everett Wessels; Jean Wessels; Charles O. Willette; Dale Wishart; Alan Yonkovich; Gary Yonkovich; Mike Yonkovich, individually and doing business as Yonkovich Bros.;

              Defendants.

------------------------------------------------

Jason Mortvedt; John Becker; Clyde Buendorf; Mark Fendrich; Harlan Hall; Daniel W. Huper; Thomas W. Huper; Roger A. Johnson; Thomas R. Jones; Kevin Kaiser; Keller Farms, Inc.; Norman R. Kohlmeyer; Elwood Langsev; Roger Legred; Thilmer M. Legred; Thomas Legred; Nathan Legred; Gerald Molskness; Nelson Farms; Selmer Nordaas;

              Plaintiffs;

Paul Obermeyer;

              Plaintiff-Appellee;

Ronald Osmundson; Gregory Schulz; Richard D. Schulz; Mark Sahr; Skogen Brothers; Todd Stewart; Yonkovich Brothers;

|                                      |     |                            |
|--------------------------------------|-----|----------------------------|
| Plaintiffs;                          | *   |                            |
|                                      | *   |                            |
| v.                                   | *   |                            |
|                                      | *   |                            |
| Grain Land Coop;                     | *   |                            |
|                                      | *   |                            |
| Defendant-Appellant;                 | *   |                            |
|                                      | *   |                            |
| Michael Christensen; Joseph Burke;   | *   |                            |
|                                      | *   |                            |
| Defendants.                          | *   |                            |

------------------------------------------

| Commodity Futures Trading | * |
|---------------------------|---|
| Commission;               | * |
|                           | * |
| Amicus on Behalf of       | * |
| Appellee.                 | * |

_____

No. 98-3304

_____

|                                         |   |                            |
|-----------------------------------------|---|----------------------------|
| Grain Land Coop;                        | * |                            |
|                                         | * |                            |
| Plaintiff-Appellee;                     | * |                            |
|                                         | * |                            |
| v.                                      | * |                            |
|                                         | * |                            |
| Kar Kim Farms, Inc.; Richard Ernest;    | * |                            |
| Blane Amundson; Dwight Andersen;        | * |                            |
| Crystal Andersen; Bruce Andersen;       | * |                            |
| Darren Anderson; Gene Anderson;         | * |                            |
| Joel Anderson; Bruce Annis; Dennis L.   | * |                            |
| Becker; John Becker; Craig Beyer;       | * |                            |
| Eldon Beyer; Mike Beyer; Bruce          | * | Appeals from the United States |
| Blakesley; Donald Bleess; Morris        | * | District Court for the     |

-5-

Blom; Paul B. Blom; Daniel Bonnett; * District of Minnesota.
Clyde Buendorf; Douglas Burgmann; *
David Burk; William L. Burk; Dean *
Caldwell; Joel Caldwell; Gary Caldwell, *
individually and doing business as *
Caldwell Farms; William Carr; *
Dahlstrom Agency; William Daly; *
Richard Dickman; Daniel Discoll; Mark *
Ristau, individually and doing business *
as Drisstau Farms; Drisstau Farms Plus; *
Patrick Ducanson; Karl Duncanson, *
individually and doing business as *
Duncanson Growers; Roger Dutton; Joel *
Eckhart; Donald Edberg; Ronald *
Erickson; Duwayne E. Evenson; Mark *
Fendrich; Marlin Fendrich; Todd *
Fenske; Heidi Fenske; Glen Frandle; *
John S. Frandle, individually and doing *
business as Frandle Brothers; Steve *
Frederick; Dale Garvick; Ivan Gesche; *
Cary Goemann; Joel Goemann; Byron F. *
Goodrich; Gary Goodrich; Neil *
Granberg; Curtis Gronewald; Kenneth *
Haase; Harlan Hall; Brian Halverson; *
Bruce Halverson; Douglas Hankerson; *
Edna Hansen; Dennis Hanson; Morris *
Hanson, Jr.; Mark Hatteberg; Thomas *
Helgeson; Bruce Helland; Harvey *
Hislop; Scott Hislop,  individually and *
doing business as Hislop Farms, Inc.; *
Dean Hoechst; Daniel Huper; Steve *
Huper; Tom Huper; Dean M. Johnson; *
Douglas Johnson; Elwood Johnson; *
Michael A. Johnson; Roger A. Johnson; *
Thomas Jones; Juergens Farms, Inc.; *
Ken Kaduce; Eugene Kaiser; Kevin *
Kaiser; Lawrence Kalis; Keller Farms, *

Inc.; David A. Kluender; Dale Koestler; Norman Kohlmeyer; Lawrence Landsteiner; Paul Landsteiner; James Landsteiner, individually and doing business as Landsteiner Farms; Elwood Langsev; Bruce Lawrence; Arlen S. Legred; Kevin Legred; Roger Legred; Thilmer M. Legred; Thomas Legred; Nathan Legred; Leland Enterprises, Ltd.; Gehard Leland; Gene Leland; Lee Manthei; Tim Manthei, individually and doing business as Manthei Brothers; Bruce Mauer; Neal Mensing; James A. Meyer; Sheldon E. Meyer; Ellen J. Molskness; Gerald Molskness; Andrew A. Monson; Erik Monson; Melvin Moore; Jason Mortvedt; Oris Mortvedt; Jon Mutschler; Nelson Farms, Inc.; Richard W. Neinow Co.; Roger D. Nimz; Selmer Nordaas;

            Defendants;

Paul Obermeyer;

            Defendant-Appellant;

Carrol Olsen; Charles Olson; Claire Olson; Diane Olson; Orin J. Olson; Shawn Olson; Todd Olson; Wayne Olson; Robert Oren; Tim Oren, individually and doing business as Oren Brothers; Ronald Osmundson; Randy Oswald; Larry G. Paul; Jeff Peterson; John Pfaffinger; Georgianne Pfaffinger; Neil Rame; David

Rennpferd; Fred Rennpferd, individually and doing business as Rennpferd Farms; Dennis Rollenhagen; Richard Rose; Steven Rose; Danny Rynearson; Dave Rynearson, individually and doing business as Rynearson Brothers; Thomas Sackett; Mark Sahr; David L. Sanders; Roger Schaper; Ron L. Schaper; Greg Schultz; Richard Schulz; George Shanahan; John Shanahan, individually and doing business as Shanahan Bros.; Roger Shirk; Steven Shirk; James Skogen; Glen Skogen, individually and doing business as Skogen Brothers; Don Slette; Sohn Dairy, Inc.; Dennis Sonnabend; Paul R. Sonnek; Robert Sonnek, Jr.; Randy Steinhauer; Dennis Stenzel; Stevens Seed Farm, Inc.; Todd Stewart; Kurt Sylvara; Dan Timm; Newton P. Toland; Scott K. Volz; Ronald Wegner; Michael Wegner, individually and doing business as Wegner Farms and doing business as Wegson Farms; Dwight Weise; Everett Wessels; Jean Wessels; Charles O. Willette; Dale Wishart; Alan Yonkovich; Gary Yonkovich; Mike Yonkovich, individually and doing business as Yonkovich Bros.;

Defendants.

---------------------------------------------

Jason Mortvedt; John Becker; Clyde Buendorf; Mark Fendrich; Harlan Hall; Daniel W. Huper; Thomas W. Huper; Roger A. Johnson; Thomas R. Jones; Kevin Kaiser; Keller Farms, Inc.;

| Norman R. Kohlmeyer; Elwood Langsev; Roger Legred; Thilmer M. Legred; Thomas Legred; Nathan Legred; Gerald Molskness; Nelson Farms; Selmer Nordaas; | * |
| | * |
| | * |
| | * |
| | * |
| | * |
| Plaintiffs; | * |
| | * |
| Paul Obermeyer; | * |
| | * |
| Plaintiff-Appellant; | * |
| | * |
| Ronald Osmundson; Gregory Schulz; Richard D. Schulz; Mark Sahr; Skogen Brothers; Todd Stewart; Yonkovich Brothers; | * |
| | * |
| | * |
| | * |
| | * |
| Plaintiffs; | * |
| | * |
| v. | * |
| | * |
| Grain Land Coop; | * |
| | * |
| Defendant-Appellant; | * |
| | * |
| Michael Christensen; Joseph Burke; | * |
| | * |
| Defendants. | * |

---------------------------------------------

| Commodity Futures Trading Commission; | * |
| | * |
| | * |
| Amicus on Behalf of Appellant. | * |

_____

Submitted: May 10, 1999

Filed: December 15, 1999
_____

Before MCMILLIAN, HEANEY, and JOHN R. GIBSON, Circuit Judges.
_____

HEANEY, Circuit Judge.

The Commodity Exchange Act (CEA), 7 U.S.C. §§ 1-25 (1999), requires that transactions in commodity futures contracts take place only under the rules of a board of trade that has been designated by the Commodity Futures Trading Commission (CFTC). Excluded from regulation under the CEA are contracts for "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11), otherwise known as cash-forward contracts. In this case, we are called upon to consider the CEA's application to a particular arrangement for the sale of grain by a farmer to a grain elevator, the Hedge-to-Arrive or Flex-Hedge-to-Arrive contract (HTA), as well as certain state-law claims arising from that arrangement.

## I. Background

Between May and September of 1995, Paul Obermeyer entered into five HTAs with Grain Land Coop (Grain Land) pertaining to corn. The HTA arrangement worked as follows: Obermeyer agreed to deliver at an unspecified time a fixed quantity and grade of grain to Grain Land. The per-bushel sale price was determined by reference to a futures contract price from the Chicago Board of Trade (CBOT) for March 1996, plus or minus a variable component referred to as "basis." Basis is the difference between the price of the designated futures contract and the cash price for that same commodity. While the CBOT reference price was fixed at the time of the contract, the basis was allowed to float until Obermeyer elected to fix it, at a point prior to the "twenty-fifth day preceding the futures month of delivery." If Obermeyer failed to set

-10-

basis prior to that day, Grain Land had the right to set basis and thereby set the sale price for the grain.

The contract also called for Grain Land to establish an offsetting "hedge" transaction by taking a "short," or sell, position on the CBOT equal to its buy obligation under the HTA. The elevator maintained a margin account with the exchange, and assumed responsibility for "margin calls" on the hedge position, increasing the account if rising futures prices caused the equity in the account to decline, as well as covering any commissions resulting from the CBOT transaction. Obermeyer's HTA contract for corn allowed him to "roll," or postpone, delivery to a later date. When Obermeyer elected to defer delivery, Grain Land also rolled its hedge, buying back its existing short position and taking a new position in the new delivery month. Any gain or loss Grain Land realized in rolling the hedge was added to or subtracted from the original futures reference price. In essence, the rolling provision allowed Obermeyer to take advantage of rising cash prices by selling his grain on the cash market and deferring delivery under the HTA.

The documents intended to create this arrangement, however, are somewhat less than clear. They begin by reciting the terms of the hedge transaction (grain, grade, quantity, and futures month), and list a destination of Kiester (a small town in south-central Minnesota) and an "Arrival Period" designated "OPEN." The contracts go on to define basis and the provisions for setting basis, and establish Grain Land's responsibility for margin and commissions resulting from the hedge. The contracts further provide that Obermeyer must set basis on or before the "twenty-fifth day preceding the futures month of delivery"; that Obermeyer must pay two cents per bushel to roll; and that Obermeyer "has the right to cancel [the] futures contract" for five cents per bushel plus or minus the accumulated spread. Finally, the contracts provide that in order to collect gains, Obermeyer "must make a delivery of grain sometime."

Changes in the price of corn beginning in the fall of 1994 led many producers to roll their delivery obligations. Specifically, both supply and demand factors conspired to drive up the price of corn.[1] Rather than eventually falling, as farmers expected, prices continued to rise through 1995 and early 1996, creating an unprecedented market "inversion." In the inverted market, demand for grain was so strong that buyers were willing to pay a premium for immediate delivery, causing prices for futures contracts with more immediate delivery dates to exceed prices for futures contracts with delivery dates that were further out.

Some farmers responded to the market inversion by rolling their HTA delivery obligations and selling their grain on the cash market, thereby obtaining higher prices than they would have obtained under their HTA contracts. Obermeyer elected in February 1996 to roll his HTAs from March to May. Under normal market conditions, producers might have been able to cover their remaining short positions by waiting until grain prices fell. However, corn prices did not drop, prompting some producers to further roll their contracts, which caused their HTA per-bushel prices to drop accordingly. Likewise, each time a producer rolled an HTA, grain merchants like Grain Land realized losses on short futures positions and had to meet mounting margin calls.[2]

## II. The Lawsuit

In response to these market conditions, on April 4, 1996, Grain Land notified its producers of a series of "policy changes" adopted by its Board of Directors. Pursuant to these policy changes, Grain Land announced that it was terminating all outstanding

---

[1]See Erik Asklesen, Hedge-to-Arrive Contracts and the Commodity Exchange Act, 7 Kan. J. L. & Pub. Pol'y 122, 126 (1998).

[2]For every penny the price of corn gained on the futures market, Grain Land had to meet approximately $200,000 in margin calls on its outstanding HTA hedge transactions.

HTAs, which permitted farmers to roll their delivery obligations, and requiring the execution of new contracts. Under the new contracts, a farmer who wished to roll his delivery obligation would be required either to maintain a cash deposit with Grain Land to cover possible rises in futures prices, or to purchase a "price protection rider" from Grain Land. On April 15, a group of more than 100 producers responded through counsel, insisting that their existing HTAs allowed them to roll their delivery obligations "for as long as they desired to do so," and demanding assurances that Grain Land would continue to honor the contracts. Grain Land replied on April 17, stating it would honor "any legal obligation" to roll the contracts until they were terminated, but that "[c]ontract holders who desire[d] to roll the hedge to arrive contracts beyond December 1996, must notify Grain Land prior to June 25, 1996 and enter into a new contract to do so." The producers refused.

In August 1996, Grain Land brought suit in various Minnesota state courts against approximately 160 farmers. Each defendant was a member of the cooperative and was a party to an HTA with an outstanding delivery obligation. In September 1996, the farmers removed the actions to the district court, which ordered the creation of a "master docket and case file" and directed the parties to file "master pleadings." Grain Land filed its master complaint in January 1997, seeking declaratory judgments (1) that the HTAs were forward contracts excluded by the CEA, or in the alternative, that even if the contracts were subject to the CEA, they were nevertheless enforceable between the parties; and (2) that the farmers were thereby obligated to deliver grain or pay damages for breaching the HTAs. Grain Land also brought state-law claims against the farmers for breach of contract.[3]

The farmers filed their master complaint in February 1997, naming as defendants Grain Land and two of its employees, Michael Christensen and Joseph Burke. The

---

[3]Grain Land also filed a third-party complaint against Farmers Commodities Corporation, which was later dismissed without prejudice.

farmers sought a declaration that the HTAs were subject to and prohibited by the CEA and therefore unenforceable, and that the farmers were entitled to recission of the HTAs because Grain Land committed fraud in violation of the CEA. The farmers also included separate counts alleging fraud under the CEA and a number of state-law claims for fraud, negligent misrepresentation, breach of fiduciary duty, and breach of contract.

Following a period of discovery, Grain Land, Christensen, and Burke moved for partial summary judgment. The district court directed the parties to address, as a preliminary matter, whether the HTAs were futures contracts within the purview of the CEA. After the court received briefs from the parties and from amici, the court ruled that although "some of the characteristics of [the HTAs] differ from more traditional cash-forward instruments, their essential terms plant them firmly within the narrow scope of the [cash-forward] exclusion." In re Grain Land Coop Cases, 978 F. Supp. 1267, 1277 (D. Minn. 1997).

The court examined the vague cash-forward exception in light of the history of the CEA, and determined that the critical inquiry was whether the parties to the HTAs expected the contracts to lead to the delivery of the commodity. The court noted that the Grain Land HTAs were made between parties who were both "in the grain business"; that the grain possessed inherent value to both parties insofar as the farmers grew the grain and Grain Land bought and sold it; that the farmers received payment only upon delivery of the actual commodity; and that "delivery and payment routinely occurred" on millions of bushels of grain, indicating the parties anticipated actual delivery of the grain. Further, the court determined the HTAs possessed certain characteristics identified by the CFTC as distinguishing forward contracts. See id. at 1276-77.

The court rejected the farmers' argument that the contracts were infused with an inordinate degree of speculativeness by virtue of the uncertain delivery date. Although

the contracts permitted the farmers to roll their delivery obligations, the court observed that the contracts nevertheless required delivery at some point. Moreover, although the HTAs included cancellation provisions, the court noted that only twelve such cancellations had been identified, and that millions of bushels of grain had been successfully delivered pursuant to the contracts since Grain Land introduced them. Finally, the court concluded that the HTAs' price terms, while flexible, were not unduly ambiguous, as they provided a mechanism for determination of a final, definite price. Accordingly, the court granted Grain Land, Christensen, and Burke's summary judgment motion with respect to the farmer's CEA-related claims. See id. at 1277. Additionally, because Obermeyer had premised his state-law claims against Christensen and Burke for breach of fiduciary duty on an argument that the HTAs effectively transformed them into commodities brokers, the court determined that these claims also failed.

The court determined, however, that the relationship between the federal and state claims was sufficiently close that it was appropriate to retain jurisdiction over the farmers' state-law claims. The court rejected Grain Land's argument that the farmers' contract action was barred by the election-of-remedies doctrine. However, the court determined that Minnesota's economic-loss doctrine precluded the farmers from recovering in tort for economic injuries that arose from a commercial transaction, and dismissed the farmers' claims of fraud and fraudulent or negligent misrepresentation. See id. at 1278-80.

Three of the approximately 160 cases were later set for a jury trial on the parties' opposing contract claims; one of those cases was Obermeyer's. At the conclusion of the trial, the jury returned a verdict in Obermeyer's favor, finding that Grain Land breached its contracts with Obermeyer and that Obermeyer did not waive his rights under the contract. As Obermeyer's sole remedy, the court rescinded the HTAs and declared them null and void. The court later denied Grain Land's post-trial motions for judgment as a matter of law, for a new trial, and to alter or amend the judgment.

Grain Land now appeals from the jury verdict in favor of Obermeyer. Grain Land also appeals the district court's denials of its motions for judgment as a matter of law, to alter or amend the judgment, and for a new trial. Obermeyer cross-appeals from the district court's partial grant of summary judgment in favor of Grain Land on both parties' claims under the CEA.[4] We affirm the district court in all respects.

III. Discussion

A. CEA

We review the district court's grant of summary judgment to Grain Land on the CEA claims <u>de novo</u>, and our task is to determine if the evidence taken in the light most favorable to Obermeyer fails to create a genuine issue of material fact and Grain Land is entitled to judgment as a matter of law. <u>See</u> <u>Regents of the Univ. of Minn. v. Chief Indus., Inc.</u>, 106 F.3d 1409, 1410 (8th Cir. 1997).

Although the CEA excludes from its reach "any sale of any cash commodity for deferred shipment or delivery," 7 U.S.C. § 1a(11), it offers no further guidance in distinguishing between an unregulated cash-forward contract and a CFTC-regulated futures contract. Nevertheless, the legislative history of the CEA and its predecessors

---

[4]We emphasize that our jurisdiction is limited to the dispute between Grain Land and Obermeyer. Although the district court's pretrial order directing the creation of a master docket and case file and the filing of master pleadings is not entirely clear as to the degree of separation maintained by the individual actions, it appears the cases were merged for convenience and efficiency only. As such, we properly have jurisdiction only from the final judgment in Obermeyer's case. <u>See</u> <u>Tri-State Hotels, Inc. v. FDIC</u>, 79 F.3d 707, 711-12 (8th Cir. 1996) (holding that where technical consolidation does not occur and cases are joined merely for convenience, "each suit retains its individual nature, and appeal in one suit is not precluded solely because the other suit is still pending before the district court").

points to a congressional distinction between the standardized and transferrable commodities futures contracts traded on markets like the CBOT and the contracts used by producers and distributors or processors to fix in the present a price for a delivery in the future. It was transactions of the former category, which usually do not result in the physical transfer of any of the underlying commodity and are vulnerable to manipulation and excessive speculation, that Congress sought to regulate through the CEA and its predecessors. See CFTC v. Co Petro Mktg. Group, Inc., 680 F.2d 573, 577-79 & nn.4-6 (9th Cir. 1982) (tracing legislative history of cash-forward exception); see also Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 786-87 (7th Cir. 1999); Andersons, Inc. v. Horton Farms, Inc., 166 F.3d 308, 318 (6th Cir. 1998). Thus, it is the contemplation of physical delivery of the subject commodity that is the hallmark of an unregulated cash-forward contract.[5] In order to determine whether a

---

[5]The Fourth Circuit has explained the distinction this way:

Because the [CEA] was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate "spot" transactions (transactions for the immediate sale and delivery of a commodity) or "cash forward" transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred) . . . . Transactions in the commodity itself which anticipate actual delivery did not present the same opportunities for speculation, manipulation, and outright wagering that trading in futures and options presented. From the beginning, the CEA thus regulated transactions involving the purchase or sale of a commodity "for future delivery" but excluded transactions involving "any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 2 . . . .

A "futures contract," or "future," never precisely defined by statute, nevertheless has an accepted meaning which brings it within the scope of transactions historically sought to be regulated by the CEA.

It is generally understood to be an executory, mutually binding agreement providing for the future delivery of a commodity on a date certain where the grade, quantity, and price at the time of delivery are

transaction is an unregulated cash-forward contract, we must decide "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future."  Andersons, 166 F.3d at 318; see also Lachmund, 191 F.3d at 787-88; CFTC v. Noble Metals Int'l, Inc., 67 F.3d 766, 772-73 (9th Cir. 1995); Oeltjenbrun v. CSA Investors, Inc., 3 F. Supp.2d 1024, 1039-40 (N.D. Iowa 1998).

Courts engaged in this inquiry have shunned self-serving labels attached to the contracts in question, and instead examined the intentions of the parties, the terms of the contract, the course of dealing between the parties, and any other relevant factors to determine whether the parties contemplated physical delivery.  This individualized, multi-factor approach scrutinizes each transaction for such characteristics as whether

---

fixed.  To facilitate the development of a liquid market in these transactions, these contracts are standardized and transferrable.  Trading in futures seldom results in physical delivery of the subject commodity, since the obligations are often extinguished by offsetting transactions that produce a net profit or loss.  The main purpose realized by entering into futures transactions is to transfer price risks from suppliers, processors and distributors (hedgers) to those more willing to take the risk (speculators).  Since the prices of futures are contingent on the vagaries of both the production of the commodity and the economics of the marketplace, they are particularly susceptible to manipulation and excessive speculation.

In contrast to the fungible quality of futures, cash forwards are generally individually negotiated sales of commodities between principals in which actual delivery of the commodity is anticipated, but is deferred for reasons of commercial convenience or necessity.  These contracts are not readily transferable and therefore are usually entered into between parties able to make and receive physical delivery of the subject goods.

Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 970-71 (4th Cir. 1993) (citations and footnote omitted).

the parties are in the business of obtaining or producing the subject commodity; whether they are capable of delivering or receiving the commodity in the quantities provided for in the contract; whether there is a definite date of delivery; whether the agreement explicitly requires actual delivery, as opposed to allowing the delivery obligation to be rolled indefinitely; whether payment takes place only upon delivery; and whether the contract's terms are individualized, rather than standardized. See Lachmund, 191 F.3d at 787; Andersons, 166 F.3d at 320; Co Petro, 680 F.2d at 578-79. We believe that this approach, which the district court applied to Obermeyer's contracts, see In re Grain Land Coop Cases, 978 F. Supp. at 1273-74, is the appropriate method to determine whether a contract contemplates actual delivery, and thus the best means of identifying those transactions which Congress sought to regulate through the CEA.[6] We now apply this analysis to Obermeyer's contracts.

We note initially that the existence of a delivery obligation is less than clear from the face of the contract documents. Indeed, the same observation has been made of contracts largely identical to Obermeyer's. See Johnson v. Land O'Lakes, Inc., 18 F. Supp.2d 985, 989-90, 994-95 (N.D. Iowa 1998) ("[T]he objective delivery obligation in the Johnsons' HTAs with Land O'Lakes is at best implied."); Oeltjenbrun, 3 F. Supp.2d at 1045-46. Nevertheless, we believe that the language of the contracts, taken as a whole, suggest a delivery obligation. We note in particular the contracts' references to Kiester as the "destination" and to a "designated arrival period."

The delivery obligation suggested by the language of the contract becomes much clearer when we look beyond the contract itself. Grain Land was in the business of obtaining grain for resale, relied on actual delivery to carry on its business, and was capable of taking delivery of the grain called for by the HTA. It entered into HTAs only with grain farmers and producers. Obermeyer, a farmer, is in the business of producing grain and is equipped for delivering grain. Moreover, the HTAs bear little

---

[6]We note amicus CFTC advocates such a multi-factor approach.

resemblance to futures contracts as traded on exchanges like the CBOT: the contract terms were individually negotiated, rather than standardized; because the contracts were not standardized, Obermeyer was unable to realize accumulated gains or losses by merely engaging in an offsetting transaction; HTAs were not offered to the general public; and Obermeyer was not required to guarantee performance by maintaining margin. Cf. Salomon Forex, Inc. v. Tauber, 8 F.3d 966, 970-71 (4th Cir. 1993); Co Petro, 680 F.2d at 579-80; In re Stovall, Comm. Fut. L. Rep. (CCH) ¶ 20,941 (Dec. 6, 1979) (setting forth what CFTC recognizes as characteristics of futures contract).

Although the HTAs have some features that tend to differentiate them from traditional cash-forward contracts, we believe the above attributes establish that the contracts in question contemplated physical delivery of the subject commodities and are therefore cash-forward contracts outside the reach of the CEA.

Obermeyer contends that the contracts "simply permitted the producer to unilaterally and unequivocally avoid setting basis and avoid delivery for any reason," permitting him to defer delivery indefinitely, and thus imposing no real obligation to deliver grain. (Appellee's Br. at 42.) He also points to the cancellation provision as permitting him to avoid delivery. These features of Obermeyer's relationship with Grain Land do not transform the HTAs into futures contracts. His ability to roll the contracts merely allowed him to delay his delivery obligation rather than avoid it altogether. Cf. Nagel v. ADM Investor Servs., No. 96-C2675, 1999 WL 692395, at *10 (N.D. Ill. Aug. 23, 1999) (Easterbrook, J.) ("Farmers' ability to defer delivery [under an HTA] is just that: a power to defer."). And cancellation–while admittedly a means of negating the delivery obligation–did not permit Obermeyer to use the HTAs to engage in unadulterated futures speculation, as the contracts provided that Obermeyer "must make a delivery of grain sometime to collect gains."[7]

---

[7]Obermeyer never sought to cancel his HTAs. There is evidence in the record that Grain Land permitted a handful of farmers to cancel their HTAs and realize gains

More fundamentally, we disagree with Obermeyer's contention that HTAs can only fall within the cash-forward exception if obligations of the parties to make or to accept delivery are inescapable. It is true that in In re Bybee, 945 F.2d 309 (9th Cir. 1991), the Ninth Circuit, guided by CFTC interpretations of the cash-forward exception, concluded that such enforceable obligations are sufficient to place a transaction within the cash-forward exception. However, we find no support for Obermeyer's contention that a mutually enforceable delivery obligation is necessary to place a transaction outside the reach of the CEA. Cf. Bybee, 945 F.2d at 315 (concluding precious-metals transactions where parties "had the legal obligation to make or take delivery upon demand of the other" were not illegal off-exchange futures transactions); MG Refining & Mktg., Inc. v. Knight Enter., Inc., 25 F. Supp.2d 175, 184 (S.D.N.Y. 1998) (rejecting contention that Bybee signaled end of multi-factor test to determine transaction's underlying purpose). While a purely contract-based analysis would render our task much easier, requiring that we look no further than the terms of the contract itself, we believe such a myopic approach would expand the gravitational pull of the CEA beyond what is suggested by the congressional policies underlying the vague text of § 1a(11). Rather, we believe the inquiry must focus on "whether there is a legitimate expectation that physical delivery of the actual commodity by the seller to the original contracting buyer will occur in the future." Andersons, 166 F.3d at 318.

Finally, we reject Obermeyer's assertion that CFTC administrative rulings in proceedings against elevators for violating the CEA through their dealings in HTAs embody a statutory interpretation to which we owe deference under Chevron, U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984). Among these

---

on the futures position, either receiving cash payments from Grain Land, or receiving the gains in the form of adjustments to the terms of other business between the farmer and the elevator. Although this evidence may be relevant to whether those particular contracts were futures contracts, we do not believe it is relevant here, inasmuch as it sheds no light on the course of dealing between Obermeyer and Grain Land.

administrative rulings is an ALJ's preliminary determination that Grain Land has violated various provisions of the CEA through its marketing and use of HTAs. See In re Grain Land Coop., CFTC Docket No. 97-1 (Nov. 6, 1998) (Initial Decision). While we have followed the general approach advocated by the CFTC by looking to the transaction's ultimate purpose, we believe the relevance of these administrative decisions is limited by a fundamental difference between these CFTC proceedings and this private lawsuit. In the administrative proceedings cited by Obermeyer, the inquiry was whether the respondent grain elevators and officials had, in the course of their dealings with multiple farmers over several years, violated various provisions of the CEA. By contrast, the question before us is limited to whether Grain Land's contracts with Obermeyer are enforceable cash-forward contracts. As such, we are not concerned with Grain Land's dealings with other farmers, and confine our discussion to the contracts and course of dealings between Obermeyer and Grain Land.

## B. Pendent Claims

Grain Land contends the district court erred in retaining jurisdiction after disposing of the CEA claims on summary judgment. We disagree. The district court did not, as Grain Land suggests, divest itself of all jurisdiction by deciding that the HTAs were not subject to the CEA. See Koke v. Stifel, Nicolaus & Co., Inc., 620 F.2d 1340, 1346 (8th Cir. 1980) (concluding that district court's grant of summary judgment on federal securities claims did not compel dismissal for lack of jurisdiction of plaintiff's pendent state claims). Nor did the district court abuse its discretion in exercising supplemental jurisdiction. We recognize that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine–judicial economy, convenience, fairness, and comity–will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988). However, this rule is not inflexible, see id., and in light of the considerable resources invested by the court in arriving at its summary judgment ruling, we are unable to say that the

district court abused its discretion, see Murray v. Wal-Mart, Inc., 874 F.2d 555, 558 (8th Cir. 1989) (noting district court's exercise of jurisdiction over state claims after dismissal of federal claims may be justified by, inter alia, substantial investment of judicial time and resources).

Next, Grain Land contends the district court erred in denying its motion for judgment as a matter of law, because the HTAs were terminable at will by their own terms under Minnesota's version of the Uniform Commercial Code (UCC) and under Minnesota common law. We review de novo, applying the same standards as the district court. See Aerotronics, Inc. v. Pneumo Abex Corp., 62 F.3d 1053, 1069 (8th Cir. 1995). We must consider the evidence in the light most favorable to Obermeyer, meaning that we (1) assume that the jury resolved all evidentiary conflicts in Obermeyer's favor; (2) assume as true all facts that Obermeyer's evidence tended to prove; (3) give Obermeyer the benefit of all favorable inferences which may reasonably be drawn from those facts; and (4) uphold the denial of the motion if, in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence. See Norton v. Caremark, Inc., 20 F.3d 330, 334 (8th Cir. 1994).

Grain Land argues it was entitled to judgment as a matter of law because the HTAs granted it the right to bring Obermeyer's rolls to an end by setting basis and requiring delivery. It points to the following provision:

> SELLER agrees to set the "Cash Basis" and determine the cash value of said grain on or before 25TH DAY PRECEDING THE FUTURES MONTH OF DELIVERY. Unless other terms have been agreed upon by both Buyer and Seller prior the [sic] said date, and grain has not been priced by seller[,] Buyer is authorized to set the Cash Basis and to set the cash price of contract.

(Appellant's Add. at D3.) This argument is without merit. We believe a reasonable jury could have interpreted the above provision to mean that Grain Land could set the

-23-

cash basis only if Obermeyer had not done so by the twenty-fifth day of the month preceding the futures reference month.[8] Because Obermeyer's HTAs were, after he rolled them, pegged to May 1996 corn futures, Grain Land would have had no right to set basis until April 25. However, it was on April 4 that Grain Land announced that it was terminating outstanding HTAs. Thus Grain Land's termination was not justified by the clause permitting it to set basis and require delivery.

Grain Land also argues the HTAs were terminable at will because, under the UCC, "[w]here the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party." Minn. Stat. Ann. § 336.2-309(2) (West 1966). According to Grain Land, rolling the HTAs constituted performance rendered successive by virtue of the fact that Obermeyer could exercise his right to roll indefinitely. Grain Land argues persuasively that rolling must be a form of performance, because it is Grain Land's refusal to roll Obermeyer's HTAs that is at the heart of his breach-of-contract claim. Obermeyer responds, also persuasively, that this argument contradicts Grain Land's argument–which we have accepted–that the underlying purpose of the HTAs was the delivery of grain, rather than futures speculation.

We believe this question must be resolved in Obermeyer's favor. Grain Land offers no authority–nor have we found any–for its contention that a contract which is, in essence, a contract for the sale of goods, and which, on its face, calls for that sale to occur but once, may be termed a contract that "provides for successive performances." We disagree with Grain Land that Obermeyer's breach-of-contract claim is therefore necessarily defeated. Assuming for the sake of argument that the only actionable breach by Grain Land was a breach of its obligation to pay for and accept delivery of Obermeyer's grain, Grain Land's refusal to roll nevertheless went to the heart of the

[8]This is the interpretation given at trial by Burke, who had been involved in marketing the HTAs.

-24-

contract. This is because rolling the contract meant not only rolling the hedge position but also rolling the date on which the grain was to be delivered.

Grain Land further argues that even if the HTAs did not require successive performance, it was permitted to terminate the HTAs under Minnesota common law. However, this common-law rule has been displaced by § 336.2-309(2), and is therefore inapplicable to commercial contracts for the sale of goods. See Minn. Stat. § 336.1-103.

Grain Land maintains the district court should have granted its motion for a new trial based on alleged evidentiary errors. The disputed evidence relates to negotiations in April 1996 between Grain Land and farmers with outstanding HTA obligations, and the district court's rulings were based on Federal Rule of Evidence 408, which excludes evidence relating to the offer or acceptance of a compromise to prove liability for or the validity of a claim. We will reverse the district court's denial of Grain Land's new trial motion if it "represents a clear abuse of discretion or a new trial is necessary to avoid a miscarriage of justice." Lamb Eng'g & Const. Co. v. Nebraska Pub. Power Dist., 103 F.3d 1422, 1430 (8th Cir. 1997) (internal quotation omitted). An evidentiary ruling does not warrant a new trial unless the evidence was so prejudicial that a new trial would likely produce a different result. See Bevan v. Honeywell, Inc., 118 F.3d 603, 612 (8th Cir. 1997). Grain Land contends that Obermeyer should not have been permitted, over its objection, to testify that in the course of settlement negotiations he made an offer to deliver the contracted grain to Grain Land and that Grain Land rejected his offer. Likewise, Grain Land argues it should have been allowed to present evidence that it too made a proposal for delivery terms, which Obermeyer rejected. Further, Grain Land maintains that the district court should have allowed it to present evidence that its termination of the HTAs was motivated by the farmers' assertions that the contracts were illegal, rather than by a Grain Land financial crisis. After a careful examination of the record, we are unable to say the district court's resolution of the disputes amounted to an abuse of its considerable discretion. Moreover, we are quite

unpersuaded that a new trial at which these evidentiary matters were resolved in Grain Land's favor would produce a different result.

Grain Land also challenges the district court's jury instructions, arguing that the instructions (1) misstated the law regarding Grain Land's right to terminate the HTAs; (2) erroneously permitted the jury to conclude that Obermeyer was not required to deliver within a reasonable time; and (3) erroneously permitted the jury to determine that Grain Land was required to honor its commitments under the HTAs in perpetuity. We review the district court's jury instructions for abuse of discretion. See Slathar v. Sather Trucking Corp., 78 F.3d 415, 418 (8th Cir. 1996). Our task is to determine whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, "fairly and adequately submitted the issues in the case to the jury." White v. Honeywell, Inc., 141 F.3d 1270, 1278 (8th Cir. 1998) (internal quotation omitted). We have already rejected Grain Land's assertion that it had a right to terminate the HTAs, and we think it clear that the remaining instructions accurately stated the applicable provisions of Minnesota's UCC.

Grain Land's final argument is that the district court should have granted its motion to alter or amend the judgment because recission is not an appropriate remedy for unreasonable notice of termination. We will not reverse absent a clear abuse of the district court's broad discretion in determining whether to grant such a motion. See Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs., 141 F.3d 1284, 1286 (8th Cir. 1998). Grain Land premises this argument on its contention that it had the right to unilaterally terminate the HTAs, reasoning that the jury's verdict must be read as finding that Grain Land failed to give Obermeyer reasonable notice of termination. This argument fails because, as we have already discussed, we do not agree with Grain Land's assertion that it had a right to terminate the HTAs. The district court's ruling was not an abuse of discretion.

Finally, Obermeyer contends the district court erred by granting Grain Land's motion in limine to exclude evidence relating to the existence of a fiduciary duty on Grain Land's part, effectively dismissing his claim against Grain Land for breach of fiduciary duty. Whether this was an evidentiary ruling, as Grain Land argues, or a dismissal, as Obermeyer argues, we decline to resuscitate the claim. We are unable to find in the record any evidence that the ruling prejudiced Obermeyer.

IV.

To sum up: we agree with the district court that Grain Land's HTAs with Obermeyer were contracts for the sale of a cash commodity for deferred delivery and therefore not subject to the CEA. We also believe that the district court properly exercised supplemental jurisdiction, and that judgment was properly entered upon the jury's verdict in favor of Obermeyer. We affirm the judgment of the district court in all respects.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.